# In the United States District Court
for the
# District of Columbia

Washington Alliance of
Technology Workers;
13401 Bel-Red Rd. #B8
Bellevue, WA 98005

*Plaintiff,*

*v.*

U.S. Dep't of Homeland Security;
Office of General Counsel
Washington, DC 20258.

*Defendant.*

Civil Action No. 1:14-cv-529

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

1. This action by Washington Alliance of Technology Workers, Local 37083 of the Communication Workers of America, the AFL-CIO ("WashTech") challenges administrative actions made by the United States Department of Homeland Security ("DHS") that permit non-student aliens to work in the United States on student visas (8 U.S.C. § 1101(a)(15)(F)(i)).

2. Specifically, this action addresses DHS's Post Completion Optional Practical Training Program (hereinafter "OPT"), a regulatory program that authorizes former students to remain the in the United States after completing school to perform labor or seek employment.[1]

3. The OPT Regulations at issue that authorize non-student aliens to perform labor on F-1 student visas are:  8 C.F.R. §§ 214.2(f)(5)(vi), 214.2(f)(10)(ii)(A)(3), 214.2(f)(10)(ii)(C), 214.2(f)(10)(ii)(D), 214.2(f)(10)(ii)(E), 214.2(f)(11)(i)(B)(2), 214.2(f)(11)(i)(C), 214.2(f)(11)(iii), 214.2(f)(12)(ii), 214.2(g)(2)(ii)(F), 274a.12(b)(6)(iv), 274a.12(c)(3)(i)(B), and 274a.12(c)(3)(i)(C).

4. These regulations exceed the authority of the DHS and are in direct contradiction to several provisions of the Immigration and Nationality Act ("INA") of 1952 as amended: 8 U.S.C. §§ 1101(a)(15)(F)(i) (requirements for F-1 student visa),

---

[1] DHS also has a pre-completion Optional Practical Training program that applies to F-1 aliens working while enrolled in school. 8 C.F.R. § 214.2(f)(10)(ii)(A)(1)–(2). That program, authorizing actual students to work, is not at issue in the complaint. For brevity, the complaint shortens *post-completion Optional Practical Training* to *OPT*. The usage in the complaint is consistent with industry practice where *OPT* invariably means *post-completion Optional Practical Training*. 8 C.F.R. § 214.2(f)(10)(ii)(A)(3). This complaint does not address the other regulations that authorize aliens to work on student visas when they actually are students.

1101(a)(15)(H)(i)(b) (requirements for H-1B guest worker visas), 1182(n) (protections from foreign labor), 1184(a) (regulations must ensure aliens leave the country when they are out of the status for), and 1184(g) (numeric limitations on foreign labor).

5.  This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and 28 U.S.C. § 1361 (mandamus).

### Jurisdiction and Venue

6.  Jurisdiction of the Court is based upon 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States defendant); 28 U.S.C. § 1361 (mandamus relief); 8 U.S.C. 1329; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* (declaratory and injunctive relief); and the Administrative Procedure Act, 5 U.S.C. §§ 702 *et seq.*

7.  Venue is properly vested in this Court as the Defendant is located in Washington, D.C. Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1391.

### Parties

8.  Plaintiff Washington Alliance of Technology Workers is Local 37083 of the Communication Workers of America, the AFL-CIO. Plaintiff is known as in the computer industry as "Washtech". WashTech was formed in 1998 by contract employees of Microsoft to build economic security and fair working conditions through collective action, bargaining, and legislative advocacy. WashTech is an influential union that represents

Science / Technology / Engineering / Mathematics (hereinafter "STEM") workers throughout the United States. The challenged regulations are intended to create a "significant expansion" in the supply of foreign workers in STEM fields and increase the competition with WashTech and its members in STEM employment. 73 Fed. Reg. 18,953.

9. Government and academic publications frequently use the terms *STEM* and *Science & Engineering* ("S&E") to refer to what the public and trade call *technology workers*.

10. Defendant DHS is the parent agency for the United States Citizenship and Immigration Services ("USCIS") and the U.S Immigration and Customs Enforcement ("ICE"). DHS is the successor to the Immigration and Naturalization Service ("INS") and the Department of Justice ("DOJ") in immigration matters. DHS, USCIS and ICE are the source of the administrative actions challenged in this action.

### The F-1 Student Visa

11. Congress permits the entry into the United States for certain non-immigrant aliens under Title 8, Section 15 of the United States Code. 8 U.S.C. § 1101(a)(15) lists the non-immigrant visas. Each subsection letter is a separate non-immigrant visa.

12. The F-1 non-immigrant student visa (hereinafter "F-1 student visa") is one of the non-immigrant visas at issue in this case. 8 U.S.C. § 1101(a)(15)(F)(1).

13. The Immigration and Nationality Act ("INA") requires that an alien on an F-1 student visa be a *bona fide* student; not abandoning his foreign residence; and entering the United

4

States temporarily and solely for the purpose of study. 8 U.S.C. § 1101(a)(15)(F)(1). That course of study must be at an approved academic institution. *Id.*

14.  After an alien has graduated, completed his course of study, or is no longer enrolled full-time in such course of study at an approved academic institution, that alien is no longer a *student* under the statutory terms of 8 U.S.C. § 1101(a)(15)(F)(1).

15.  Congress requires that DHS regulations ensure that an alien on an F-1 student visa will leave the country when that alien ceases to be a student and has not obtained another visa. 8 U.S.C. § 1184(a)(1).

16.  Once an alien on an F-1 student visa has graduated or completed his course of study, that alien is no longer a *student.*

17.  DHS is required to ensure that former students on F-1 student visas leave the country.

18.  DHS ignores the requirements § 1184(a) by allowing former students to remain in the United States and to work under its OPT program.

## The H-1B Visa

19.  The H-1B nonimmigrant visa (hereinafter "H-1B visa") is the other non-immigrant visa at issue in this case. 8 U.S.C. § 1101(a)(15)(H)(i)(b).

20.  The H-1B visa is the normal mechanism for foreign, college-educated aliens to be admitted temporarily into the United States to perform labor in STEM fields. 8 U.S.C. § 1101(a)(15)(H)(i)(b).

21. Congress established the H-1B program in the Immigration Act of 1990, Pub. L. 101-649, § 205, 104 Stat. 4978 (codified at 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(g) and 1182(n)).

22. H-1B visas are available to aliens who work in *specialty occupations*; occupations that require a college degree or equivalent. 8 U.S.C. § 1184(i)(2).

23. The H-1B visa is primarily used for STEM workers. In FY 2008, about 73% of new H-1B visas went to STEM workers.

24. In FY 2009, 63% of H-1B visas went to STEM workers.

25. An H-1B visa permits the applicant to work and reside in the United States for up to 36 months. 8 C.F.R. § 214.2 (h)(9)(iii)(A).

26. An H-1B visa is renewable for up to 72 months. 8 U.S.C. § 1184(g)(4).

27. In creating the H-1B program, Congress established protections for domestic workers, such as Washtech members.

28. These protections include quotas on admissions, 8 U.S.C. § 1184(g), and labor certification requirements. 8 U.S.C. § 1182(n).

29. In many years the statutory quotas on H-1B visas protecting domestic labor have been exhausted.

30. Congress was already aware of and had addressed the issue of aliens on F-1 visas not being able to get an H-1B visa after graduation due to the quotas.

31. In 2004, Congress created a separate pool of 20,000 visas dedicated to aliens on F-1 (student) visas. Consolidated Appro-

priations Act of 2005. Pub. L. 108-447, 118 Stat. 2809, § 425
(codified at 8 U.S.C. § 1184(g)(5)(c)).

### The OPT Program

32.  The only statutory authorization for aliens to work in the
United States while on F-1 student visas was a three-year trial
program that has now expired. The Immigration Act of 1990,
Pub. L. 101–649, 104 Stat. 4978, § 122.

33.  Prior to 1990 and after 1994, all authorization for aliens to
work on student visas solely have been solely by regulation.

34.  Although no statute currently permits F-1 student visa hold-
ers to work, DHS and its predecessors have permitted and pro-
gressively expanded work under F-1 student visas through
regulation since the creation of the current F-1 student visa in
1952.

35.  When the current F-1 student visa was created, Immigration
and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, regu-
lations authorized aliens to work on student visas for "practical
training" only when such work was "required or recommended
by the school." 8 C.F.R. § 125.15(b)(1948).

36.  The authorized work period in 1952 was 6 months and could
be extended only when the school and training agency certified
that that the practical training could not be completed in a
shorter period of time. 8 C.F.R. § 125.15(b)(1948).

37.  Now, DHS has several regulatory-created F-1 student visa
work programs.

38.  The only such program at issue in this case is called *Post
Completion Optional Practical Training* (hereinafter "OPT").

39. The OPT program allows aliens admitted on F-1 student visas to remain in the United States, work, or be unemployed seeking work after they have graduated from an academic institution.

40. This means that aliens on OPT are not *students* under the definition of the F-1 statute.

41. The term *Optional Practical Training* (OPT) first appears in a 1992 INS interim rule. Pre-Completion Interval Training; F-1 Student Work Authorization, 57 Fed. Reg. 31,954 (proposed July 20, 1992)(8 C.F.R. § 214.2).

42. These 1992 regulations authorized an alien on an F-1 student visa to work for up to twelve months after graduation or completion of studies under Post Completion OPT. *Id.*

43. This 1992 rule was promulgated without notice and comment.

44. In 2002, DHS changed 8 C.F.R. § 214.2 (F)(10)(ii)(A)(3)) to remove the requirement that aliens on OPT be enrolled at a school. Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS), 67 Fed. Reg. 76,256 (proposed Dec. 11, 2002)(codified at 8 C.F.R. § 212.1, 212.2, 212.3) ("Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training.")

45. In 2008, DHS changed the nature of the OPT program from educational to one for supplying labor to United States industry.

46. DHS declared the statutory limits Congress imposed on the number of H-1B guest worker visas that protect WashTech and its members from foreign labor create a, "competitive disadvantage" for United States employers. 73 Fed. Reg. 18,946.

47. To remedy this alleged "competitive disadvantage," DHS devised regulations designed to circumvent the statutory H-1B quotas and "significantly expand" the number of alien STEM workers that could be employed in the United States. 73 Fed. Reg. 18,953.

48. The 2008 OPT rule authorized aliens who had graduated from postsecondary schools with degrees in STEM fields and who were unable to obtain an H-1B visa, to remain in the United States on F-1 student visas and work for 29–35 months. Extending Period of Optional Practical Training by 17-Months for F-1 nonimmigrant Students with STEM (Science, Technology, Mathematics, and Engineering) Degrees and Expanding Cap-Gap Relief for All F-1 Students with Pending H-1B Petitions, 73 Fed. Reg. 18,944–56 (proposed Apr. 8, 2008)(codified at 8 C.F.R. §§ 214, 274a)(The "2008 OPT Rule").

49. The 2008 OPT Rule has been in place as an "Interim Final Rule" since 2008. DHS has announced it would publish a "Final Rule" multiple times but has never done so. Fall 2011 Statement of Regulatory Priorities, 77 Fed. Reg. 7,736 (Feb. 13, 2012); Statement of Regulatory Priorities, 75 Fed. Reg. 79,540 (Dec. 20, 2010); The Regulatory Plan, 74 Fed. Reg. 64,144 (Dec. 7, 2009).

50. DHS promulgated the 2008 OPT Rule without notice and comment. *Id.*

51. In 2011, DHS expanded the number of fields eligible for the longer 29–35 months OPT period.

52. This 2011 expansion was announced in a press release with no administrative procedures followed whatsoever. Press Release, "ICE announces expanded list of science, technology, engineering, and math degree programs," Immigration and Customs Enforcement, May 21, 2011 (the "2011 OPT Expansion").

53. In 2012, DHS again expanded the number of fields eligible for the longer 29–35 months OPT period.

54. This 2012 expansion was announced in a press release with no administrative procedures followed whatsoever. Press Release, "DHS Announces Expanded List of STEM Degree Programs," U.S. Dept. of Homeland Security, May 11, 2012 (the "2012 OPT Expansion").

### Injury to Washtech and its Members

55. DHS's OPT program allowing non-students to work on student visas injures Washtech and its members by depriving Washtech and its members of statutory protections from foreign labor (8 U.S.C. §§ 1182(n), 1184(g)); by increasing the number of economic competitors; and by creating unfair competition by allowing aliens to work under rules in which they are inherently less expensive to employ.

56. DHS's OPT regulations are designed to circumvent the statutory H-1B quotas (8 U.S.C. § 1184(g)) by allowing aliens in

STEM fields who would be denied guest worker visas due to the quotas to work on F-1 student visas instead.

57. This process deprives Washtech members of their statutory protections limiting the amount of foreign labor. 8 U.S.C. § 1184(g).

58. DHS's OPT program also allows foreign labor to be admitted into the United States without complying with the statutory labor certification requirements that Congress has put in place for college-educated labor under 8 U.S.C. § 1182(n).

59. This deprives Washtech members of protections under the statutory guestworker scheme established by Congress. 8 U.S.C. § 1182(n).

60. The STEM fields represented by Washtech members are specifically targeted by DHS's OPT regulations for increased competition from foreign labor.

61. DHS admits that it intends its OPT regulations to create a, "significant expansion" in the number of STEM workers in the United States. 73 Fed. Reg. 18,953.

62. Increasing the number of foreign STEM workers through regulation created additional economic competitors for Washtech members in the labor market.

63. After promulgating the 2008 OPT Rule, the number of approvals to work on OPT has soared from 28,497 to 123,328 between FY 2008 and FY 2013. GAO, "Student and Exchange Visitor Program: DHS Needs to Assess Risks and Strengthen Oversight of Foreign Students with Employment Authorization", Feb. 2014, p. 14.

64. Washtech's injury from using the F-1 student visa to "significant[ly] expan[d]" the number of competitors in the STEM labor market is exacerbated by the preferential tax treatment for F-1 student visa holders.

65. Aliens on F-1 visas are classified as Non-Resident Aliens so that they and their employers do not pay Medicare and Social Security taxes as is required for Washtech members. 26 U.S.C. § 3121.

66. This taxation treatment makes workers on OPT inherently cheaper to employ than WashTech members.

67. Some domestic universities tout on their websites that it is cheaper to hire F-1 student visa holders than American citizens, like WashTech members.

68. For example, the San Francisco State University's web site states, "In fact, a company may save money by hiring international students because the majority of them are exempt from Social Security (FICA) and Medicare tax requirements." http://www.sfsu.edu/~sicc/documents/handouts/employers/HiringIntlStudents.pdf (last visited Mar. 27, 2014).

69. The competition to WashTech and its members created by Optional Practical Training ("OPT") is present and visible in the job market.

70. Many employers post job advertisements for STEM workers stating that they are seeking workers on OPT exclusively, excluding WashTech and its members from obtaining these jobs.

71. For example, on or about Sept. 26, 2013, IBM agreed to pay a $44,000 civil penalty to resolve allegations that the company

violated the anti-discrimination provision of the Immigration
and Nationality Act (INA) when it placed online job postings
for application and software developers that contained citizen-
ship status preferences for F-1 and H-1B temporary visa hold-
ers. Press Release, "Justice Department Settles Citizenship
Status Discrimination Claim Against IBM", U.S. Department
of Justice, Sept. 27, 2013 available at
http://www.justice.gov/opa/pr/2013/September/13-crt-1091.html
(last visited Mar. 27, 2014).

72. IBM's advertisements, posted on its own corporate recruiting
web site, specifically stated that applicants, "Should have a val-
id OPT work permit for legal work authorization in the US."

73. Foreign labor on OPT is only available to domestic employers
through DHS's regulations.

74. Therefore, a favorable decision from the court would remove
the injuries pled.

75. DHS's predecessor (DoJ) has acknowledged that Congress
intended to protect domestic workers (including WashTech
members) from foreign labor working on F-1 student visas.

76. DoJ stated,

> The F-1 student employment program in the final rule rep-
> resents a careful balance between the [Immigration and
> Naturalization] Service's desire to allow foreign students
> every opportunity to further their educational objectives in
> this country and the need to avoid adversely affecting the
> domestic labor market. The House Judiciary Committee
> report on HR 4300 . . . demonstrated a clear Congressional
> concern about the Service's plan to expand student em-
> ployment authorization without any built-in labor safe-
> guards. 56 Fed. Reg. 55,610 (Oct. 29, 1991).

77. The only time Congress has ever authorized aliens to work on F-1 visas, it required that the aliens be paid the prevailing wage to protect domestic workers. The Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978, § 122 (A three-year trial program that has expired).

78. The House of Representatives noted that its work program, "subject[ed] employers to an attestation requirement similar to that for other visas, requiring recruitment of United States workers and payment of prevailing wages." H.R. 101-723, 6746.

79. Rennie Sawade is a WashTech member. He is a contract computer programmer with a degree in computer science. That means that he works for various employers on a temporary basis, receiving an hourly wage but no benefits. Because of the temporary nature of his work, he is constantly seeking new employment opportunities. Computer programming is one of the degrees DHS target for increasing the labor supply under the 2008 OPT Rule, making him an economic competitor with non-students working on OPT.

80. Since 2010, Mr. Sawade applied to Microsoft for STEM jobs three times.

81. Microsoft has applied to DHS for over 100 STEM OPT extensions under the 2008 OPT Rule.

82. Over a dozen contract labor companies that claim to supply labor to Microsoft have placed advertisements seeking OPT workers on various job boards.

83. On or about June 6, 2011, Mr. Sawade applied to Aerotek for a STEM job.

84. As of Sept. 23, 2010, Aerotek had over 40 STEM OPT extensions approved by DHS.

85. On or about Apr. 19, 2010 Mr. Sawade applied to Amazon.com for a STEM job.

86. Amazon.com has applied to DHS for at least 19 STEM OPT extensions.

87. On or about Oct. 14, 2010, Mr. Sawade applied to Comsys for a contract position at Microsoft.

88. Comsys has applied to DHS for over 20 STEM OPT extensions.

89. At least six companies that claim to supply workers to Comsys on their web sites have placed advertisements seeking OPT workers.

90. On or about Jan. 21, 2012, Mr. Sawade responded to an advertisement posted by Capsquare Systems on DICE.COM that stated, "OPTs are accepted." Mr. Sawade received no response from Capsquare Systems.

91. Capsquare Systems has applied to DHS for at least 18 STEM OPT extensions.

92. On the same day Sawade applied to a job advertised on DICE.COM posted by People Tech Group stating "we need OPT/CPT/H1/ EAD/Green Card/Citizens with valid legal status".[2]

93. As of Sept. 23, 2010, People Tech Group had at least one STEM Optional Practical Training extension approved by DHS.

---

[2] Optional Practical Training (OPT), Circular Practical Training (CPT), Employment Authorization Document (EAD), H1 (H-1B Visa)

94. On or about Oct. 4, 2010, Mr. Sawade applied to Facebook for a STEM job.

95. Facebook has applied to DHS for at least 8 STEM OPT extensions.

96. Since July 2011, Mr. Sawade applied to 5 different jobs at Boeing.

97. On or about May 3, 2011, the contract labor company Converse Technology Solutions, posted an advertisement on DICE.COM for STEM workers. The advertisement states, "We are looking for candidates Local to Seattle,WA. preference can be given to qualified OPT candidates. (*sic*)"

98. Converse's web site states that Boeing is one of its clients.

99. Converse has applied to DHS for at least two STEM OPT extensions.

100. On or about May 26, 2010, June 3, 2010, and June 17, 2010 the contract labor company Info Targets, placed job advertisements on DICE.COM stating that OPT states was a requirement. Info Targets' web site states that Boeing is a client.

101. Info Targets has applied to DHS for at least four STEM OPT extensions.

102. Douglas Blatt is a Washtech member. Blatt has a degree in Information Technology. Blatt works as a computer programmer. When Blatt is unable to find permanent employment, he works as a contract programmer. He is an economic competitor with aliens on OPT. Information Technology is a degree DHS has targeted for increasing the labor supply under the 2008

OPT Rule, making him an economic competitor with non-students working on OPT.

103.   In 2010, Mr. Blatt applied for temporary STEM work at JP Morgan Chase four times.

104.   JP Morgan Chase has applied to USCIS for at least 9 OPT extensions for computer workers.

105.   At least 20 contract computer labor companies that claim to supply workers to JP Morgan Chase have placed job advertisements seeking workers on OPT.

106.   On or about June 2, 2010, Mr. Blatt applied for a STEM job at Ernst & Young.

107.   At least one contract computer labor company that claims to supply workers to Ernst & Young has placed advertisements seeking workers on OPT.

108.   Ernst & Young has applied to USCIS for at least 4 OPT extensions.

109.   On or about Sept. 20, 2010, Mr. Blatt applied for a STEM job at IBM.

110.   IBM has posted least eight advertisements for computer jobs located in the United States on its corporate recruiting website that include the requirements that the applicant must be on OPT and have an Indian work authorization. Several of these advertisements state that the work could be located anywhere in the U.S.

111.   IBM has applied to USCIS for at least 30 OPT extensions for computer workers.

112.  At least 25 contract computer labor companies that claim to supply workers to IBM have placed advertisements seeking workers on OPT.

113.  On order about Feb. 25, 2011, Mr. Blatt applied to a STEM job at Hewlett Packard.

114.  At least nine contract computer labor companies that claim to supply workers to Hewlett Packard have placed advertisements seeking workers on OPT.

115.  Hewlett Packard has applied to USCIS for at least 19 OPT extensions for computer workers.

116.  On or about July 7, 2011, Mr. Blatt applied for a STEM job at CSC.

117.  At least 5 contract computer labor companies that claim to supply workers to CSC have placed advertisements seeking workers on OPT.

118.  CSC has applied to USCIS for at least 6 OPT extensions for computer workers.

119.  On or about Oct. 24, 2011, Mr. Blatt applied for a STEM job at Continental Airlines.

120.  Continental Airlines has applied to USCIS for at least 4 OPT extensions for computer workers.

121.  On or about June 11, 2012, Mr. Blatt applied for a STEM job at Sabre Holdings.

122.  Sabre Holdings has applied to USCIS for at least 4 OPT extensions for computer workers.

123. At least four contract computer labor companies that claim to supply workers to Sabre Holdings have placed advertisements seeking workers on OPT.

124. Ceasar Smith is a computer systems and networking administrator and Washtech member. He has a degree in Business Administration. Smith is a temporary employee so his job search is continuous. Network and computer systems administrators are fields specifically targeted for increasing the labor supply by the 2008 OPT Rule, making Smith an economic competitor with nonstudents working on OPT.

125. As with Mr. Blatt, Mr. Smith applied for STEM positions at IBM in Apr. 2008 and May 2008.

126. As with Mr. Blatt, Mr. Smith applied for STEM positions at Hewlett Packard in Apr. 2009 and Apr. 2010.

127. Mr. Smith applied for STEM positions at FedEx in Apr. 2008, June 2008, Oct. 2011, and May 2012.

128. USCIS has approved at least two STEM OPT extensions for computer workers at FedEx.

129. At least six contract computer labor companies that claim to supply labor to FedEx have placed job advertisements seeking OPT workers.

130. In May 2008, Mr. Smith applied for a STEM job at American Airlines.

131. American Airlines has applied to USCIS for at least 2 OPT extensions for computer workers.

132. At least 2 contract computer labor companies that claim to supply labor to American Airlines have placed job advertisements seeking workers on OPT.

133. In July 2008, Mr. Smith applied for a STEM job at Genesis Networks.

134. Genesis Networks has applied to USCIS for at least 3 OPT extensions for computer workers.

135. In Jan. 2009 and Dec. 2011, Mr. Smith applied for STEM jobs at Dell.

136. Dell has applied to USCIS for at least 15 OPT extensions for computer workers.

137. At least five computer contract labor companies that claim to supply labor to Dell have placed job advertisements seeking workers on OPT.

138. In Jan. 2009 and Nov. 2011, Mr. Smith applied for STEM jobs at Lockheed Martin.

139. Lockheed Martin has applied to USCIS for at least 2 OPT extensions for computer workers.

140. The computer contract labor company Spendtek has placed at least two advertisements seeking computer workers on OPT that have specified Lockheed Martin as an end client.

141. As with Mr. Blatt, Mr. Smith applied to CSC for a computer job in Apr. 2009.

142. In Jan. 2010, Mr. Smith applied for a STEM job at Affiliated Computer Services.

143. Affiliated Computer Services has applied to USCIS for at least 6 OPT extensions for STEM workers.

144.  In Oct. 2011, Mr. Smith applied to AT&T for a STEM job.

145.  AT&T has applied to USCIS for at least 8 OPT extensions for STEM workers.

146.  At least twelve contract computer labor companies that claim to supply workers to AT&T have placed advertisements seeking workers on OPT.

147.  As with Mr. Sawade, Mr. Smith applied to Microsoft for a STEM job in Nov. 2011.

148.  In Jan. 2012, Mr. Smith applied to NCR for a STEM job.

149.  NCR has applied to USCIS for at least 6 OPT extensions for STEM workers.

150.  In May 2012, Mr. Smith applied to Sprint for a STEM job.

151.  Sprint has applied to USCIS for at least 15 OPT extensions for STEM workers.

152.  At least six computer contract labor companies that claim to supply labor to Sprint have placed job advertisements seeking workers on OPT.

153.  In May 2012, Mr. Smith applied for a STEM job at SAIC.

154.  SAIC has applied to USCIS for at least 4 OPT extensions for STEM workers.

**Count I: DHS exceedes its authority under 8 US.C. § 1101(a)(15)(F)(i) by authorizing non-students to work on student visas.**

155.  All prior allegations are incorporated by reference.

156.  DHS is authorized to admit foreign students under the following terms:

> [] an alien having a residence in a foreign country which he *has no intention of abandoning*, who is a *bona fide* student

> qualified to pursue a full course of study and who *seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study* consistent with section 214(l) at an established college, university, . . . or other academic institution . . . in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to *report to the Attorney General the termination of attendance* of each nonimmigrant student. . . . [emph. added.] 8 U.S.C. § 1101(a)(15)(F)(1)

157.   However, 8 C.F.R. § 214.2(f)(5) provides—

> Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution approved by the Service for attendance by foreign students, *or engaging in authorized practical training following completion of studies*, . . . [emph. added]

158.   DHS's regulations use the euphemism "practical training" to describe *work* by non-students aliens on F-1 student visas.

159.   DHS defines "Practical training," merely as "temporary employment . . . directly related to the student's major area of study. 8 C.F.R. § 214.2(f)(10)(ii)(3). There is no requirement that training actually take place or that any course of study be followed.

160.   The ongoing practice of authorizing aliens admitted on student visas to remain in the U.S. and work after graduation while no longer a student under 8 C.F.R. § 214.2(f)(5) is in direct conflict with the statutory requirements of 8 U.S.C. § 1101(a)(15)(F)(i) that aliens be admitted solely for the purpose of pursuing a course of study and is in excess of DHS's statutory authority.

161.   8 C.F.R. § 214.2(f)(10)(ii)(A) provides—

> [] A student may be granted authorization to engage in temporary employment for optional practical training: . . .

> (3) After completion of the course of study, . . . . Continued enrollment, for the school's administrative purposes, . . . does not preclude eligibility for optional practical training.

162.   This is ongoing practice of allowing aliens to remain and work in the U.S. when they are not enrolled at a school is in direct conflict with the requirement of 8 U.S.C. § 1101(a)(15)(F)(i) that aliens on student visas be pursuing a course of study at an approved academic institution and it in excess of DHS's statutory authority.

163.   8 C.F.R. § 214.2(f)(10)(ii)(E) provides—

> (E) Periods of unemployment during post-completion OPT [Optional Practical Training]. During post-completion OPT, F-1 [student visa] status is dependent upon employment. Students may not accrue an aggregate of more than 90 days of unemployment during any post-completion OPT carried out under the initial post-completion OPT authorization. Students granted a 17-month OPT extension may not accrue an aggregate of more than 120 days of unemployment during the total OPT period comprising any post-completion OPT carried out under the initial post-completion OPT authorization and the subsequent 17-month extension period.

164.   This regulation (promulgated in the 2008 OPT Rule), authorizing aliens to be unemployed and looking for work while on student visas, is in direct conflict with the statutory requirements of 8 U.S.C. § 1101(a)(15)(F)(i) that aliens on student visa be *bona fide* students pursuing a course of study at an approved academic institution and is in excess of DHS's statutory authority.

165. DHS justifies permitting aliens admitted on student visas to work in the United States after graduation by claiming a need to remedy purported labor shortages. Press Release, "ICE announces expanded list of science, technology, engineering, and math degree programs", U.S. Immigrations and Customs Enforcement, May 12, 2011, available at http://content.govdelivery.com/bulletins/gd/USDHSICE-7434c (Last visited Mar. 28, 2014).

166. DHS further stated that OPT extensions should be only granted in fields where there is a labor shortage. 73 Fed. Reg. 18,948.

167. However, Congress has designated the Department of Labor as the agency responsible for determining the state of the labor market in immigration statutes. Immigration and Nationality Act of 1952, Pub. L. 82–414, 66 Stat. 163, § 211; Immigration and Nationality Act of 1965, Pub. L. 89–236, 79 Stat. 911, §§ 201, 204, 211; The Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978, §§ 121, 122, 205, 221, 601.

168. Congress did not grant DHS the authority to remedy labor shortages under 8 U.S.C. § 1101(a)(15)(F)(i) [F-1 student visa].

169. DHS does not have the statutory authority to declare or expertise to determine that there is a "critical shortage" STEM workers.

170. Using student visas to remedy purported labor shortages is in excess of the authority granted to DHS under 8 U.S.C. § 1101(a)(15)(F) [F-1 student visa].

171.  By exceeding its authority under 8 U.S.C. § 1101(a)(15)(F)(i), as described in the previous paragraphs, DHS acts in violation of 5 U.S.C. § 706(2)(C).

**Count II. DHS's OPT regulations are in direct conflict the requirement 8 U.S.C. § 1184(a) that regulations must ensure aliens leave the country when they are out of status.**

172.  All prior allegations are incorporated by reference.

173.  8 U.S.C. § 1184(a) provides—

> (1) The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, . . ., to insure that at the expiration of such time or *upon failure to maintain the status under which he was admitted*, or to maintain any status subsequently acquired under section 1258 of this title, *such alien will depart from the United States.* . . . [emph. added]

174.  8 U.S.C. § 1184(a) requires DHS to ensure aliens on student visas leave the country when they are not longer students.

175.  DHS does not comply with § 1184(a) because its regulations and practices allow aliens on student visas to remain in the United States, work, and be unemployed after graduation.

176.  DHS's OPT program is in excess of its authority and in violation of 5 U.S.C. § 706(2)(C).

**Count III: DHS's OPT regulations are in conflict with the statutory requirements for foreign labor under 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n), 1184(g)**

177.  All prior allegations are incorporated by reference.

178. DHS's current Optional Practical Training ("OPT") regulations are designed to circumvent the statutory labor protections for domestic workers in the H-1B program.

179. DHS's OPT regulations deliberately circumvent the statutory caps on H-1B visas (§ 1184(g)), by allowing aliens who are unable to get an H-1B visa to remain in the United States and work on an F-1 student visa instead.

180. DHS's OPT regulations authorize aliens to perform labor without complying with and in violation of the labor certification and prevailing wage requirements of the H-1B program that would otherwise be applied to the foreign labor working under the OPT program. §§ 1101(a)(15)(H)(i)(b), 1182(n).

181. One domestic labor protection is that the Dep't of Labor has the authority to ban abusers of the H-1B program.

182. Nonetheless, the OPT program permits abusive employers to circumvent this ban on foreign labor.

183. For example, Peri Software Solutions of Newark, N.J. was recently barred from the H-1B program by the Dept. of Labor for violating its provisions. Press Release, U.S. Dept. of Labor, Wage and Hour Division, Dec. 7, 2010, Press Release Number 10-1528-NEW (available at http://www.dol.gov/opa/media/press/whd/whd20101528.htm last visited Mar. 27, 2014).

184. Under the statutory guestworker scheme, Peri should be deprived access to foreign labor.

185. However, Peri continues to hire foreign STEM labor through the DHS OPT Program. Peri Software Solutions has applied to

DHS for at least 32 OPT extensions and DHS has approved at least 30 of those extensions since Peri's ban from the H-B program.

186.   For the reasons given above, DHS's OPT program is in excess of its authority and in violation of 5 U.S.C. § 706(2)(C).

### Count IV: The 2008 OPT Rule was implemented arbitrarily and capriciously.

187.   All prior allegations are incorporated by reference.

188.   While DHS promulgating the 2008 OPT Rule, DHS acted highly capriciously and arbitrarily by employing misrepresentation to fabricate a nonexistent labor shortage; failing to consider the overwhelming evidence that no such labor shortage existed; tying extended OPT period to fields with labor shortage but failing to defining how such a shortage is determined; establishing a longer OPT period without any justification for the chosen duration; expanding the period of time on student visa without giving any educational justification; giving no consideration to the impact increasing the amount of foreign labor would have on domestic workers; and providing no explanation how remedying labor shortages is related to its authorization to admit foreign students.

### A. The 2008 OPT Rule's findings establish a STEM worker shortage solely by misrepresenting a National Science Foundation study.

189.   DHS's justification for the 2008 OPT Rule in its findings is a purported "critical shortage" of workers in STEM fields and the need to supply industry with foreign labor. 73 Fed. Reg. 18,947.

190. This justification of the need to provide foreign labor to industry is cited repeated throughout the 2008 OPT Rule's findings. 73 Fed. Reg. 18,944–56.

191. The 2008 OPT Rule's findings cite no published research that actually establishes the purported "critical shortage" of STEM workers it intended to solve through its regulation. 73 Fed. Reg. 18,944–56.

192. The full record administrative record contains no published research that concludes there is a, "critical shortage" of STEM workers.

193. DHS's assertions of a STEM labor shortage (73 Fed. Reg. 18,947–48) are in direct conflict with the overwhelming weight of published research that has found there is no shortage of STEM workers in the United States.

194. Lacking an authoritative source to establish a STEM worker shortage needed to justify the 2008 OPT Rule, DHS resorted to misrepresentation and simply invented one.

195. The DHS findings cite only one study to establish the purported "critical shortage" of STEM workers to justify the claimed need for the 2008 OPT Rule expanding the amount of foreign STEM labor above the Congressionally set caps. 73 Fed. Reg. 18,947 ("The National Science Foundation, Rising Above the Gathering Storm: Energizing and Employing America for a Brighter Economic Future (2007), pp. 78–83") (hereinafter "*Rising Above the Gathering Storm*").

196.  DHS's findings falsely claim that this study, "describe[es] the
critical shortages of science, math, and engineering talent in
the United States." *Id.*

197.  The section cited in *Rising Above the Gathering Storm* is ti-
tled "International Competition for Talent." It has nothing to
do with labor shortages in the United States. *Rising Above the
Gathering Storm*, at pp. 78–83.

198.  Instead it discusses how other countries have adopted the
United States education model (*Id.* at 78); the challenge for
United States universities to attract foreign students (*Id.* at
78–79); how other countries seek to benefit from advanced edu-
cation (*Id.* at 79–82); and concludes that the flow of foreign re-
searchers and graduate students "is unlikely to be curtailed
permanently, at least as long as the world sees the United
States as the best place for science and engineering education,
training, and technology-based employment." *Id.* at 82–83.

199.  *Rising Above the Gathering Storm* does not conclude that
there is a critical shortage of STEM workers as DHS claimed in
its findings for the 2008 OPT Rule.

200.  By resorting to misrepresentation to establish the justifica-
tion for its 2008 OPT Rule, DHS's promulgation of the 2008
OPT Rule was *highly* capricious in violation of 5 U.S.C.
§ 706(2)(A).

### B. The 2008 OPT Rule's findings failed to consider the abundant evidence that there is no STEM worker shortage.

201. The 2008 OPT Rule's findings arbitrarily failed to consider any study or evidence that demonstrates no STEM worker shortage exists in the United States.

202. The full administrative record contains no study or evidence that concludes there is no STEM worker shortage in the U.S.

203. The overwhelming weight of empirical evidence and studies of the STEM labor market find that no shortage of STEM workers in the United States exists.

204. That evidence was available for DHS to use in its decision making process. *E.g.*, William P. Butz, "Will the Scientific and Technology Workforce Meet the Requirements of the Federal Government?", RAND, 2004, p. xv (Prepared for the Office of Technology Policy and finding there has not been a shortage of STEM workers and such a shortage is not likely).

205. By failing to consider any evidence that there is no STEM worker shortage in the United States, DHS failed to consider an important aspect of the problem, making the agency action arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

### C. The 2008 OPT Rule fails to establish a rational process for defining fields with labor shortages.

206. An important aspect of the problem of identifying fields with a labor shortage is the procedure for establishing that a field has a shortage.

207. Fields eligible for the Optional Practical Training ("OPT") extension are listed on the web site http://www.ice.gov/sevis. 8 C.F.R. § 214.2(f)(10)(C)(1), 73 Fed. Reg. 18,954.

208. The 2008 OPT Rule establishes no procedure for fields to be added or removed from this list or who is authorized to modify this list.

209. By failing to establish a procedure for adding or removing fields from the OPT extension eligibility list, Defendants acted arbitrarily and capriciously by failing to consider an important aspect of the problem in violation of 5 U.S.C. § 706(2)(A).

### D. The 2008 OPT Rule's findings give no explanation for the duration of labor authorized.

210. The length of the OPT work period is an important factor that should have been considered in the rulemaking process.

211. The findings give no reason why DHS chose a duration of 29 months (nearly two and a half years) that each F-1 visa holder could work on OPT or what purpose that length of time serves.

212. The only explanation for the 29-month duration in the full administrative record is that employers of foreign labor lobbying for the expansion requested that term.

213. Microsoft's chief lobbyist requested 29-months in a letter to the Secretary of Homeland Security. A.R. 121.

214. A letter from the industry lobbying group CompeteAmerica requested 29-months. A.R. 115.

215. A joint letter signed by 8 employers of foreign labor (including Microsoft), also requested 29-months. A.R. 133.

216. None of letters explain why the length of Optional Practical Training should be 29-months.

217. By failing to consider the appropriateness of a 29-month duration, the purpose it serves or other possible durations for OPT, the government acted arbitrarily and capriciously in

promulgating the 2008 OPT Rule by failing to consider an important aspect of the problem in violation of 5 U.S.C. § 706(2)(A).

### E. The 2008 OPT Rule's findings give no educational purpose for its authorization of labor under student visas.

218.   The F-1 student visa is limited to *bona fide* students pursuing a course of study.

219.   Given that students working under the 2008 OPT Rule are remaining in the United States on F-1 student visas, some kind of educational purpose should have been a prime consideration in promulgating the Rule.

220.   However, the findings make no mention of any educational purpose for the 2008 OPT Rule. 73 Fed. Reg. 18,944–56.

221.   By failing to consider an educational purpose to the OPT program, DHS failed to consider an important aspect of the problem in violation of 5 U.S.C. § 706(2)(A).

### F. The 2008 OPT Rule's findings give no consideration to the effect that authorizing foreign labor will have on United States Workers in the same fields.

222.   The effect of foreign student employment on domestic labor has been of great concern to Congress. H.R. Rep. No. 101-723, 101st Cong., 2d Sess. at 67, reprinted in 1990 U.S. Code Cong. & Admin. News 6710.

223.   DHS's predecessor (INS) acknowledged this Congressional concern in the past when addressing work under student visas. 56 Fed. Reg. 55,608 (Oct. 29, 1991) ("[There was] clear Congressional concern about the [INS] Service's plan to expand

student employment authorization without any built-in labor safeguards.").

224. The 2008 OPT Rule's findings failed to assess how the planned "significant increase" in the flow of foreign workers without providing any domestic labor protections would effect United States workers, such as WashTech and its members. 73 Fed. Reg. 18,944–56.

225. By failing to consider the 2008 OPT Rule's effect on United States workers, DHS failed to consider an important aspect of the problem in violation of 5 U.S.C. § 706(2)(A).

### G. The 2008 OPT Rule's findings give no explanation how DHS's authorization to admit foreign students also grants it the authority to remedy labor shortages.

226. The justification for the 2008 OPT Rule is the need to supply labor to industry. 73 Fed. Reg. 18,944–56.

227. The statutory authorization for Student Visas is limited to *bona fide* students and does not authorize supplying labor to industry. 8 U.S.C. § 1101(a)(15)(F).

228. By considering the need to supply labor to industry, Defendants relied on factors that Congress has not intended it to consider in violation of 5 U.S.C. § 706(2)(A).

### Count V: DHS waived notice and comment when it promulgated the 2008 OPT Rule when no good cause existed.

229. All prior allegations are incorporated by reference.

230. Under 5 U.S.C. § 553(b), agencies are required to establish good cause in a rule's findings before waiving notice and comment.

231. The 2008 OPT Rule was implemented without notice and comment. 73 Fed. Reg. 18,950.

232. DHS was under no external mandate (*e.g.*, statutory or court order) to implement the 2008 OPT Rule by any particular date.

233. Any deadline to promulgate the 2008 OPT Rule was entirely self-imposed.

234. DHS had over a year's notice to prepare the 2008 OPT Rule.

235. The first entry in the Administrative Record after the rule text is dated Mar. 7, 2007. A.R. 97.

236. In that entry, Bill Gates warns in Congressional Testimony that the H-1B quota for F.Y. 2008 would run out in the first month applications were accepted. A.R. 106.

237. On Nov. 15, 2007, Microsoft's chief lobbyist requested an expansion of OPT duration and that the extension be in place by the following spring. A.R. 121.

238. The 2008 OPT Rule was promulgated without notice and comment on Apr. 8, 2008.

239. DHS asserted good cause existed to waive notice and comment because, "the delay created by the notice and comment requirements would result in serious damage to important interests." 73 Fed. Reg. 18,950.

240. The 2008 OPT Rule's findings give no explanation why the rule could not have been implemented while providing notice

and comment within the one year or more that DHS had notice regarding its purported need for the rule.

241. If the need for 2008 OPT Rule were as urgent as DHS asserted when waiving notice and common, DHS should have solicited notice and comment for the 2008 OPT Rule at the time the agency became aware of the problem on March 7, 2007—more than a year earlier prior to the 2008 OPT Rule's promulgation.

242. DHS could have done the same after Apr. 2007 when the H-1B quota was exhausted in days.

243. DHS could have acted in Nov. 2007 when Microsoft's chief lobbyist lobbied DHS for the rule in November of 2007.

244. Any of those times would have allowed ample time for DHS to provide notice and permit comments.

245. Instead, DHS's simply delayed acting for over a year until its own self-imposed deadline was reached.

246. If an agency is may waive notice comment by simply by setting its own, self-imposed deadline and then delay drafting a regulation until that deadline is reached, the APA's notice and comment procedure could be waived for any rule—making the notice and comment requirement meaningless.

247. The exhaustion of the H-1B quota is not an emergency. It is a natural consequence of Congress imposing limits on H-1B admissions.

248. By failing to provide the required notice and comment for the 2008 OPT Expansion, DHS is in violation of 5 U.S.C. § 706(2)(D).

249.   Any after the fact notice and comment and action to promul-
gate a final rule based on the 2008 OPT Expansion would be
fruitless commentary on a *fait accompli.*

**Count VI: DHS promulgated the 2008 OPT Rule without
following the regulations governing incorporation by
reference.**

250.   All prior allegations are incorporated by reference.

251.   Congress granted the Administrative Committee of the Fed-
eral Register the authority to promulgate regulations in the
Federal Register. 44 U.S.C. § 1506.

252.   Under its Congressionally granted authority, the Adminis-
trative Committee of the Federal Register has promulgated
regulations governing the procedure for agencies to incorporate
documents by reference in their own regulations. 1 C.F.R.
part 51.

253.   The 2008 OPT Rule promulgated regulations at 73 Fed. Reg.
18,954 providing—

> (codified at 8 C.F.R. § 214.2 (f)(10)(ii)(G))
>
> 17-month extension of post completion OPT for students
> with a science, technology, engineering, or mathematics
> (STEM) degree. . . . The extension will be for an additional
> 17 months, for a maximum of 29 months of OPT, if all of
> the following requirements are met.
>
> . . . .
>
> (2) The degree that was the basis for the student's current
> period of OPT is a bachelor's, master's, or doctoral degree
> in one of the degree programs on the current STEM Desig-
> nated Degree Program List, published on the SEVP Web
> site at *http://www.ice.gov/sevis.* . . . [Emph. added]

254.  8 C.F.R. § 214.2 (f)(10)(ii)(G) incorporates by reference a list published on the agency's web site, http://www.ice.gov/sevis.

255.  However, DHS did not follow the requirements of 1 C.F.R. part 51. Specifically, DHS's use of an external list on a web site violates the provisions of incorporation by reference requirements for regulations of 1 C.F.R. part 51 in five ways.

256.  First, the use of an external list was not approved by the Director of the Federal Register as required by 1 C.F.R § 51.1.

257.  Second, the use of an external list is not a type of material eligible for incorporation by reference under 1 C.F.R. § 51.7;

258.  Third, the use of an external list fails to use the words "incorporated by reference" as required by 1 C.F.R. § 51.9(b)(1).

259.  Fourth, the use of an external list fails to state "the title, date, edition, author, publisher, and identification number of the publication" as required by 1 C.F.R. § 51.9(b)(1).

260.  Fifth, the use of an external list fails to refer to 5 U.S.C. § 552(a) as required by 1 C.F.R. § 59(b)(5).

261.  Furthermore, incorporating this list on its website is in direct contradiction to the published guidance from the Director of the Federal Register that states, "Agencies are not authorized to incorporate by reference material on their web sites as a substitute for Federal Register publication." http://www.archives.gov/federal-register/cfr/ibr-locations.html (Last visited Mar. 27, 2014).

262.  In promulgating the 2008 OPT Extension, DHS failed to comply with the incorporation by reference requirements of

1 C.F.R. part 51, in violation of the requirement to follow pro-
cedures required by law. 5 U.S.C. § 706(2)(D).

**Count VII: DHS unlawfully promulgated the 2011 OPT
Expansion without following the procedures required
by the Administrative Procedures Act.**

263.   All prior allegations are incorporated by reference.

264.   The 2008 OPT Rule established a list of STEM fields eligible
for 17-month OPT extensions.

265.   This list is maintained by DHS on its web site. 8 C.F.R.
§ 214.2 (f)(10)(ii)(C)(2).

266.   The lists of degrees fields eligible for extended period of work
under the Optional Practical Training ("OPT") program consti-
tute a rule under 5 U.S.C. § 551(4).

267.   In 2011, DHS expanded the number fields eligible for STEM
OPT extensions merely by amending its list on its web site.

268.   The amendment of the list of fields made by the 2011 OPT
Expansion is rulemaking under 5 U.S.C. § 551(5).

269.   DHS is required to provide notice and comment before rule-
making under 5 U.S.C. § 553(b).

270.   DHS failed to provide notice and comment before making the
2011 OPT Expansion.

271.   DHS did not publish any findings of good cause for not
providing notice and comment.

272.   Changes to a document incorporated by reference require
publication in the Federal Register under 1 C.F.R. § 51.11.

273.   DHS failed to publish the changes to its field eligibility list in
the Federal Register.

274. The failure to provide notice and comment and the failure to publish changes to a document incorporated by reference are both agency actions made without observance of proper procedure required by law, in violation of 5 U.S.C. § 706(2)(d).

**Count VIII: DHS unlawfully promulgated 2012 OPT Expansion without following the procedures required by the Administrative Procedures Act.**

275. All prior allegations are incorporated by reference.

276. In 2012, DHS expanded the number fields eligible for STEM OPT extensions merely by amending its list on its web site.

277. DHS failed to provide notice and comment before making the 2012 OPT Expansion and DHS did not publish any findings of good cause for not providing notice and comment.

278. The failure to provide notice and comment for the 2012 OPT Expansion is unlawful for the same reasons given in Count VII for the 2011 OPT Expansion.

**Prayer for Relief**

Plaintiffs pray that this Court:

1. Enter a declaratory judgment that Defendant exceeded its statutory authority when it allowed F-1 student visa holders to work after completing their course of study by creating the Optional Practical Training ("OPT") Program;

2. Permanently enjoin DHS from authorizing aliens who are not *bona fide* students, pursuing a full course of study at an approved academic institutions, to engage in employment on F-1 student visas;

3. Enter a declaratory judgment that the 2008 OPT Rule is null and void because it is in excess of Defendant's statutory authority, that the DHS implemented the Rule arbitrarily and capriciously, and that DHS unlawfully implemented the Rule without notice and comment and that the 2008 OPT Rule is therefore null and void;

4. Enter a declaratory judgment that any subsequent agency action purporting to finalize the 2008 OPT Rule final is null and void;

5. Enter a declaratory judgment that the 2011 Optional Practical Training Expansion was made unlawfully without notice and comment and therefore is null and void;

6. Enter a declaratory judgment that the 2012 Optional Practical Training Expansion was made unlawfully without notice and comment and therefore is null and void;

7. Order DHS to notify all non-student aliens for whom it authorized employment under its regulations that such work must cease immediately;

8. Award Plaintiffs their costs and expenses, including reasonable attorney's fees and expert witness fees;

9. Award any other relief the court deems just and proper.

John M. Miano
D.C. #1003068
Attorney of Record for
Washington Alliance of
Technology Workers

Garrett R. Roe
Michael M. Hethmon
Immigration Reform Law
Institute
25 Massachusetts Ave., N.W.
Suite 335
Washington, D.C. 20001

**Certificate required by LCvR 7.1**
**of the Local Rules of the**
**United States District Court**
**for the**
**District of Columbia**

Washington Alliance of Technology Workers v.

U.S. Dep't of Homeland Security;

Civil Action No. 1:14-cv-529

I, the undersigned, counsel of record for Washington Alliance of Technology Workers, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries or affiliates of Washington Alliance of Technology Workers which have any outstanding securities in the hands of the public:

None

These representations are made in order that judges of this court may determine the need for recusal.

John M. Miano
D.C. #1003068
Attorney of Record for Washington Alliance of Technology Workers.

**Certificate required by LCvR 26.1**
**of the Local Rules of the**
**United States District Court**
**for the**
**District of Columbia**

Washington Alliance of Technology Workers v.

U.S. Dep't of Homeland Security;

Civil Action No. 1:14-cv-529

I, the undersigned, counsel of record for Washington Alliance of Technology Workers, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock of Washington Alliance of Technology Workers which have any outstanding securities in the hands of the public:

None

These representations are made in order that judges of this court may determine the need for recusal.

_____

John M. Miano
D.C. #1003068
Attorney of Record for Washington Alliance of Technology Workers.

43