**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **WASHINGTON ALLIANCE OF TECHNOLOGY WORKERS,** <br><br> *Plaintiff*, <br><br> v. <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY,** <br><br> *Defendant.* |

Civil Action No. 14-529 (ESH)

## MEMORANDUM OPINION

Plaintiff Washington Alliance of Technology Workers, a collective-bargaining organization that represents science, technology, engineering, and mathematics ("STEM") workers, has sued the U.S. Department of Homeland Security ("DHS"). Plaintiff challenges an interim final rule promulgated by defendant DHS in April 2008 extending, for eligible STEM students, the duration of optional practical training ("OPT"), which allows nonimmigrant foreign nationals on an F-1 student visa to engage in employment during and after completing a course of study at a U.S. educational institution. *See* 8 C.F.R. § 214.2(f)(10)(ii). Before this Court are the parties' cross motions for summary judgment. (Pl.'s Cross Mot. for Summ. Judgment or Judgment on the Administrative Record [ECF No. 25] ("Pl.'s Mot.")); Def.'s Mot. for Summ. Judgment [ECF No. 27] ("Def.'s Mot.").) For the following reasons, both motions will be granted in part and denied in part.

## BACKGROUND

The Immigration and Nationality Act ("INA") creates several classes of nonimmigrants who are permitted to enter the United States for a limited time and for a specific purpose. 8

U.S.C. § 1101(a)(15).  This case involves two such classes.  First, F-1 visas provide entry for

individuals who qualify as

> an alien having a residence in a foreign country which he has no intention of
> abandoning, who is a bona fide student qualified to pursue a full course of study
> and who seeks to enter the United States temporarily and solely for the purpose of
> pursuing such a course of study . . . at an established . . . academic institution . . . .

*Id.* § 1101(a)(15)(F)(i).  Second, H-1B visas cover individuals who fall into the following

category:

> an alien . . . who is coming temporarily to the United States to perform services . .
> . in a specialty occupation . . . and with respect to whom the Secretary of Labor
> determines and certifies to the Secretary of Homeland Security and the Secretary
> of State that the intending employer has filed with the Secretary of Labor an
> attestation under section 212(t)(1) . . . .

*Id.* § 1101(a)(15)(H)(i)(b).  A "specialty occupation" requires the attainment of a bachelor's

degree.  *Id.* § 1184(i)(1).  An alien may not obtain an H-1B visa unless his employer has

certified, among other things, that the alien will be paid at least "the prevailing wage level for the

occupational classification in the area of employment."  *Id.* § 1182(t)(1).  The total number of H-

1B visas is currently capped by Congress at 65,000 per year.  *Id.* § 1184(g).

The INA gives the Executive Branch authority to issue regulations governing the

admission of nonimmigrants.  *See id.* § 1184(a)(1) ("The admission to the United States of any

alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General

may by regulations prescribe . . . .").  For almost 70 years, DHS and its predecessor, the

Immigration and Naturalization Service ("INS"), have interpreted the immigration laws to allow

students to engage in employment for practical training purposes.  *See* 12 Fed. Reg. 5355, 5357

(Aug. 7, 1947) ("In cases where employment for practical training is required or recommended

by the school, the district director may permit the student to engage in such employment for a

six-month period subject to extension for not over two additional six-month periods . . . .").  At

present, students may engage in OPT "[a]fter completion of the course of study, or, for a student in a bachelor's, master's, or doctoral degree program, after completion of all course requirements for the degree." 8 C.F.R. § 214.2(f)(10)(ii)(A)(3). The employment must be "directly related to the student's major area of study." *Id.* § 214.2(f)(10)(ii)(A). Before 2008, a student could only be authorized for 12 months of practical training, which had to be completed within a 14-month window following the student's completion of his course of study. *See id.* § 214.2(f)(10) (2007).

In April 2008, DHS issued an interim final rule with request for comments that extended the period of OPT by 17 months for F-1 nonimmigrants with a qualifying STEM degree. Extending Period of Optional Practical Training by 17 Months for F-1 Nonimmigrant Students with STEM Degrees and Expanding Cap-Gap Relief for All F-1 Students With Pending H-1B Petitions, 73 Fed. Reg. 18,944 (Apr. 8, 2008) ("2008 Rule"). As such, STEM students can now engage in a maximum of 29 months of OPT. *See* 8 C.F.R. § 214.2(f)(10)(ii)(C). In describing the purpose of the 2008 Rule, DHS explained that "the H-1B category is greatly oversubscribed," with visa applications reaching the 65,000-person cap progressively earlier every year since 2004. 2008 Rule at 18,946. In 2007, the cap was reached on April 2, the first business day for filing. *Id.* As a consequence,

> OPT employees often are unable to obtain H-1B status within their authorized period of stay in F-1 status, including the 12-month OPT period, and thus are forced to leave the country. The inability of U.S. employers, in particular in the fields of science, technology, engineering and mathematics, to obtain H-1B status for highly skilled foreign students and foreign nonimmigrant workers has adversely affected the ability of U.S. employers to recruit and retain skilled workers and creates a competitive disadvantage for U.S. companies.

*Id.* DHS concluded that the 2008 Rule would alleviate the "competitive disadvantage faced by U.S. high-tech industries" and would "quickly ameliorate some of the adverse impacts on the U.S. economy" by potentially adding "tens of thousands of OPT workers . . . in STEM

occupations in the U.S. economy." *Id.* at 18,947-50.  DHS noted that the 2008 Rule was issued

without notice and public comment "[t]o avoid a loss of skilled students through the next round

of H-1B filings in April 2008." *Id.* at 18,950.  Since promulgating this interim rule, DHS has on

several occasions modified, without notice and comment, the list of disciplines that qualify for

the STEM extension via updates to their website.  (*See* Pl.'s Mot., App. A [ECF No. 25-2] at 34-

35.)

      Plaintiff filed suit on March 28, 2014.  In Counts I-III, plaintiff alleges that the OPT

program exceeds DHS's statutory authority and conflicts with other statutory requirements,

including the labor certifications related to H-1B visas.  In Count IV, plaintiff argues that DHS

acted arbitrarily and capriciously in promulgating the 2008 Rule.  In Count V, plaintiff argues

that DHS lacked good cause to waive the notice and comment requirement in promulgating the

rule.  In Count VI, plaintiff contends that DHS's reference to an external website to list the

STEM courses of study violates the relevant rules on incorporation by reference.  In Counts VII-

VIII, plaintiff claims that DHS improperly failed to allow for notice and comment before issuing

the 2011 and 2012 modifications of the list of STEM disciplines.  And in Count IX, plaintiff

argues that the 2008 Rule and the subsequent 2011 and 2012 modifications exceeded DHS's

statutory authority.

      On November 21, 2014, this Court granted in part and denied in part defendant's motion

to dismiss.  *Wash. Alliance of Tech. Workers v. DHS*, No. 14-cv-529, 2014 U.S. Dist. LEXIS

163285 (D.D.C. Nov. 21, 2014).  First, the Court dismissed Counts I-III on the ground that "the

Complaint does not identify a single WashTech member who has suffered an injury as a result of

the twelve-month OPT program." *Id.* at *9.  In the alternative, this Court held that Counts I-III

were barred by APA's six-year statute of limitations. *See id.* at *10 n.3.  The Court found,

however, that the complaint did allege sufficient facts to confer onto plaintiff standing to

challenge the 2008 Rule and the 2011 and 2012 modifications.  *See id.* at *15.  Plaintiff filed an

Amended Complaint on December 15, 2014.  (*See* First Am. Compl. for Declaratory and

Injunctive Relief [ECF No. 20] ("Compl.").)

The parties have now filed cross motions for summary judgment.

## ANALYSIS

### I.   STANDING

This Court has already held that "plaintiff's Complaint . . . is sufficient to establish

Article III standing."  *Wash. Alliance*, 2014 U.S. Dist. LEXIS 163285, at *15.  The Court found

that the complaint alleged that plaintiff's "named members, who have technology-related degrees

in the computer programming field and have applied for STEM employment during the relevant

time period, were in direct and current competition with OPT students on a STEM extension"

and that "[t]his competition resulted in a concrete and particularized injury."  *Id.*  Nevertheless,

defendant now argues that "[b]ecause Plaintiff has failed to provide the required specific,

particularized evidence necessary to demonstrate that its three members are in direct and current

competition for jobs with OPT students on STEM extensions, its members lack competitor

standing and consequently, Plaintiff lacks associational standing to proceed."  (*See* Def.'s Mem.

of Law. in Opp. to Pl.'s Cross Mot. for Summ. Judgment [ECF No. 36] ("Def.'s Opp.") at 2.)

To establish constitutional standing, plaintiff must demonstrate that (1) it has suffered an

injury-in-fact, (2) the injury is fairly traceable to defendant's challenged conduct, and (3) the

injury is likely to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560-61 (1992).  "'The party invoking federal jurisdiction bears the burden of establishing'

standing – and, at the summary judgment stage, such a party 'can no longer rest on . . . mere

allegations, but must set forth by affidavit or other evidence specific facts.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148-49 (2013) (quoting *Lujan*, 504 U.S. at 561).  Because plaintiff is an association seeking to establish standing to sue on behalf of its members, it must show that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).  Only the first element of this test is at issue here.  *See Wash. Alliance*, 2014 U.S. Dist. LEXIS 163285, at *8.

Plaintiff argues that its members have been injured by DHS's OPT program because that program "increase[s] the number of economic competitors" and "expose[s] Washtech members to unfair competition by allowing aliens to work under rules in which they are inherently less expensive to employ."  (Pl.'s Mot. at 12.)  "The competitor standing doctrine recognizes 'parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.'"  *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)).  "A party seeking to establish standing on the basis of the competitor standing doctrine 'must demonstrate that it is a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action.'"  *Id.* at 1013 (quoting *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004)).  In the competitor sales context, the D.C. Circuit has held that "petitioners sufficiently establish their constitutional standing by showing that the challenged action authorizes allegedly illegal transactions that have the clear and immediate *potential* to compete with the petitioners' own sales. They need not wait for specific, allegedly illegal

transactions to hurt them competitively." *La. Energy & Power Auth.*, 141 F.3d at 367 (quoting *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C. Cir. 1990)).

Plaintiff has submitted substantial evidence to support its standing, including affidavits from its president and three of its members. (*See* Aff. of Douglas J. Blatt [ECF No. 25-1] ("Blatt Aff."); Aff. of Rennie Sawade [ECF No. 25-1] ("Sawade Aff."); Aff. of Michael Schendel [ECF No. 25-1] ("Schendel Aff."); Aff. of Ceasar Smith [ECF No. 25-1] ("Smith Aff.").)  Douglas Blatt states that he is "employed currently as a computer programmer" and lists twelve programming jobs that he applied for between 2010 and 2012. (*See* Blatt Aff. ¶¶ 7-18.)  Rennie Sawade states that he is "employed currently as a temporary programmer" working "on a contract basis" and that he applied for programming jobs at numerous software companies between 2010 and 2014, including Microsoft, Amazon, and Facebook. (Sawade Aff. ¶¶ 6-37.) Ceasar Smith states that he is a "temporary computer systems and network administrator" and that he applied for computer technician and computer system administrator positions at multiple companies between 2008 and 2014. (Smith Aff. ¶¶ 5-43.)  Michael Schendel, plaintiff's president, notes that "[m]any employers openly solicit OPT participants for jobs to the exclusion of WashTech members," and he includes with his affidavit one such solicitation seeking a software engineering in Redmond, Washington, the location of Microsoft. (Schendel Aff. ¶ 12.) In addition to these affidavits, plaintiff has submitted dozens of job listings seeking individuals with computer programming experience. (*See* Pl.'s Mot., App. B [ECF No. 25-3].)  Many of these job advertisements are limited to, or at least targeted at, OPT candidates. (*E.g.*, *id.* at 7, 17, 35, 53.)  Others state that OPT status is "preferred" or list OPT as one of several acceptable statuses. (*E.g.*, *id.* at 9, 11, 24, 40, 93.)

This evidence is more than sufficient to support plaintiff's constitutional standing.  The affidavits from Blatt, Sawade, and Smith demonstrate that they are "part of the computer programming labor market, a subset of the STEM market."  *Wash. Alliance*, 2014 U.S. Dist. LEXIS 163285, at *14.  The affidavits also show that those individuals "have sought out a wide variety of STEM positions with numerous employers, but have failed to obtain these positions following the promulgation of the OPT STEM extension in 2008."  *Id.*  The 2008 Rule was explicitly intended to increase the number of foreign nationals competing for jobs in the STEM labor market.  *See* 2008 Rule at 18,953 ("This rule will . . . add[] an estimated 12,000 OPT students to the STEM-related workforce. . . . [T]his number represents a significant expansion of the available pool of skilled workers.").  These facts alone suffice to show that the regulation "ha[s] the clear and immediate *potential*" to expose plaintiff's members to increased workforce competition.  *La. Energy & Power Auth.*, 141 F.3d at 367 (quoting *Associated Gas Distribs.*, 899 F.2d at 125).  The dozens of job advertisements submitted by plaintiff – many of which express a preference for OPT computer programmers – suggest that the potential for increased competition has indeed come to pass.

Defendant lodges multiple objections, most of which this Court addressed in its previous Memorandum Opinion.  Defendant argues that plaintiff must demonstrate that its members "work in the *same* job category, that they are willing to work the *same* jobs going to STEM-OPT students, and that they are qualified to do so."  (Def.'s Opp. at 6.)  In a similar vein, defendant insists that "Plaintiff must demonstrate with specific facts that the jobs Messrs. Sawade, Blatt, and Smith attest to applying to in their affidavits were jobs that [they] *and* OPT students were applying to."  (*Id.* at 10.)  Defendant demands too much.  Plaintiff has demonstrated that its members work in the computer programming field, which is among the disciplines encompassed

by DHS's STEM regulations.  *See STEM-Designated Degree Program List: 2012 Revised List*,

http://www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf (last visited Aug.

5, 2015).  Defendant has failed to cite any D.C. Circuit case that requires a greater degree of

specificity.  In *Mendoza*, for example, the Department of Labor had issued regulations easing the

rules for employing alien sheepherders and goatherders.  *See Mendoza*, 754 F.3d at 1008-09.

The D.C. Circuit held that "individuals competing in the herder labor market have standing" to

challenge the regulations.  *Id.* at 1013.  Notwithstanding the fact that the plaintiffs had "not

worked as herders since 2011 and may not have applied for specific herder jobs since that time,"

the Circuit found that the *Mendoza* plaintiffs had standing because they were "experienced and

qualified herders" who "continue[d] to monitor the herder job market."  *Id.* at 1013-14.  Nowhere

in *Mendoza* did the Circuit suggest that the plaintiffs needed to be willing to accept precisely the

same jobs as the hypothetical aliens who were affected by the agency's regulations.  The

*Mendoza* Court certainly did not require affidavits stating that the plaintiffs had applied to the

same jobs as the affected aliens.  Rather, it was sufficient that "plaintiffs' affidavits . . .

demonstrate[d] their informal involvement in the labor market."  *Id.* at 1014.  Plaintiff in the

present case has proven substantially more than the *Mendoza* plaintiffs.  Its members are active

participants in the computer programming labor market, and they have applied to numerous

programming jobs since DHS promulgated the 2008 Rule.  That is sufficient to confer

competitor standing.

      Defendant also argues that plaintiff's members are not part of the computer programming

market because they are presently employed.  (Def.'s Opp. at 8-9.)  This argument is meritless.

A worker does not exit his job market simply because he currently has a job.  An influx of OPT

computer programmers would increase the labor supply, which is likely to depress plaintiff's

members' wages and threaten their job security, even if they remain employed.  Moreover, being

presently employed does not eliminate plaintiff's members' incentive to continue looking for

jobs.  For example, one of plaintiff's members "work[s] on software projects on a contract basis

rather than as an employee."  (Sawade Aff. ¶ 6.)  He explains that "[c]ompanies can end

temporary jobs without notice" and states that, "[s]ince 2003, [he has] had to find a new

programming job twelve times when [his] temporary jobs have ended."  (*Id.* ¶ 7.)  In light of this

evidence, the Court concludes that plaintiff has sufficiently demonstrated that the competition its

members face as a result of the 2008 Rule constitutes an "'injury in fact' that is 'actual or

imminent.'"  *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *Lujan*, 504 U.S. at

560); *see also KERM*, 353 F.3d at 60-61 (to establish competitor standing, plaintiff must prove

that he is "likely to suffer financial injury as a result of the challenged action"); *DEK Energy Co.

v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001) (in the competitor standing context, a plaintiff

must merely show that there is a "substantial . . . probability of injury," and "there is no need to

wait for injury from specific transactions" (internal quotation marks omitted)) .

      Finally, defendant contends that plaintiff's complaint constitutes a generalized grievance

"akin to 'taxpayer standing'" because the group of STEM job applicants is "a vague and

generalized category that includes over 150 categories of separate jobs."  (Def.'s Opp. at 14

(citing *United States v. Richardson*, 418 U.S. 166 (1974)).)  As plaintiff correctly points out,

however, "DHS confuses *widespread injury* with a *generalized grievance*."  (Reply in Supp. of

Pl.'s Mot. for Summ. Judgment [ECF No. 41] ("Pl.'s Reply") at 5.)  "Although injuries that are

shared *and* generalized – such as the right to have the government act in accordance with the law

– are not sufficient to support standing, 'where a harm is concrete, though widely shared, the

Court has found injury in fact.'"  *Seegars v. Ashcroft*, 396 F.3d 1248, 1253 (D.C. Cir. 2005)

(citation omitted) (quoting *FEC v. Akins*, 524 U.S. 11, 24 (1998)).  The 2008 Rule cannot escape review simply because it encompasses a large number of disciplines.

In short, plaintiff has amply demonstrated that its members are direct and current competitors of the aliens benefited by the 2008 Rule.  *See Mendoza*, 754 F.3d at 1013.  Plaintiff therefore has standing to sue.

## II.   ZONE OF INTERESTS

Defendant argues that plaintiff "cannot establish that it falls within the zone of interest of the statutory provision that forms the crux of its complaint."  (Def.'s Mem. of Law on the Lack of Zone-of-Interest Standing [ECF No. 22] ("Def.'s ZOI Mem.") at 1.)  Defendant contends that "the F-1 statute's text . . . does not indicate that Congress was concerned with protecting the domestic labor market in providing for a foreign student program" and that plaintiff cannot "rely[] on the general labor protections under the H-1B nonimmigrant category" to prove that its complaint is proper.[1]  (*Id.* at 5, 8.)

To bring suit under the APA, "[t]he interest [plaintiff] asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). To make this determination, the Court must "apply traditional principles of statutory

---

[1] Defendant did not raise this objection in its motion to dismiss.  (*See* Def.'s Mot. to Dismiss for Lack of Subject-Matter Jurisdiction [ECF No. 10].)  Concerned about its jurisdiction, this Court issued an Order on December 4, 2014, asking the parties to submit memoranda of law. Notwithstanding the Court's error, the zone-of-interests argument has now been briefed. Contrary to plaintiff's assertion, defendant did not waive this argument by failing to address it in its motion to dismiss.  *See* Fed. R. Civ. P. 12(h)(2) (explaining that Rule 12(b)(6) arguments can be made in pleadings, by motion under Rule 12(c), or at trial).  This Court will therefore address the zone-of-interests question, even though it was not raised by defendant, as it should have been, via Rule 12(b)(6).

interpretation" to assess "whether [plaintiff] has a cause of action under the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387-88 (2014).  The zone-of-interests test "is not meant to be especially demanding." *Patchak*, 132 S. Ct. at 2210 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

Broadly stated, plaintiff is asserting that defendant used the F-1 nonimmigrant category to circumvent the restrictions Congress placed on H-1B visas.  In so doing, plaintiff argues that defendant violated a number of statutes.  The complaint alleges that the 2008 Rule "is in direct conflict with the statutory requirements of 8 U.S.C. § 1101(a)(15)(F)(i) that aliens on student visa[s] be *bona fide* students."[2]  (Compl. ¶ 164.)  It also alleges that the 2008 Rule violates 8 U.S.C. § 1184(a), a general directive that, according to plaintiff, "requires DHS to ensure aliens on student visas leave the country when they are no longer students."  (*Id.* ¶ 174.)  Finally, the complaint alleges that the "OPT regulations are in conflict with the statutory requirements for foreign labor under 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n), [and] 1184(g)" because they "deliberately circumvent the statutory caps on H-1B visas" and "authorize aliens to perform labor without complying with and in violation of the labor certification and prevailing wage requirements of the H-1B program."  (*Id.* ¶¶ 179-80.)

In light of these allegations, the Court disagrees with defendant's assertion that plaintiff's complaint is limited solely to violations of F-1.  Rather, plaintiff objects more broadly that

---

[2] This quote, and several that follow, are from Counts I-III, which this Court previously dismissed.  But they apply with equal force to Count IX, which incorporates by reference all previous allegations.  (*See* Compl. ¶ 279.)

defendant's interpretation of F-1 indirectly violates other limitations set forth by Congress, notably those related to H-1B visas.  As such, it is proper to examine the zone of interests protected by H-1B, as well as F-1.  *See Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 804 (D.C. Cir. 1985) (looking to zone of interests protected by § 1101(a)(15)(H) when plaintiff alleged that INS had attempted to circumvent that provision by issuing visas pursuant to § 1101(a)(15)(B)).  And, plaintiff is clearly within the zone of interests of H-1B and its related statutes, which include many provisions designed to protect American labor.  *See* 8 U.S.C. § 1182(n) (requiring employer certification that the H-1B nonimmigrant will be paid prevailing market wages, that the employer will provide working conditions for the nonimmigrant employee that will not adversely affect working conditions for the other workers, and that there is not a strike at the place of employment); *id.* § 1184(g) (setting caps on H-1B visas).

Defendant, citing the non-precedential Third Circuit decision in *Programmers Guild, Inc. v. Chertoff*, 338 F. App'x 239 (3d Cir. 2009), objects that this Court should not consider H-1B and related statutes in its zone-of-interest inquiry "because these statutes are not integrally related to the statute under which the agency acted in allegedly violating the law."  (Def.'s ZOI Mem. at 7.)  The D.C. Circuit has explained that, "[i]n determining whether a petitioner falls within the 'zone of interests' to be protected by a statute, 'we do not look at the specific provision said to have been violated in complete isolation[,]' but rather in combination with other provisions to which it bears an 'integral relationship.'"  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (per curiam) (alteration in original) (quoting *Fed'n for Am. Immigration Reform, Inc. v. Reno* (*FAIR*), 93 F.3d 897, 903 (D.C. Cir. 1996)).  As explained above, plaintiff alleges direct violations of H-1B.  Beyond that, however, the Court

concludes that F-1 and H-1B are integrally related.  The provisions are part of the same statute;

indeed, they are contained within a single subsection of the statute.  *See* 8 U.S.C. § 1101(a)(15).

Even more important than the statute's codification scheme, though, is the substantive

relationship between the provisions.  F-1 is directed at students studying at an American

academic institution, including colleges and universities.  *See id.* § 1101(a)(15)(F)(i).  H-1B is

limited to individuals who have completed their bachelor's degree.  *See id.* § 1184(i)(1).  As

such, F-1 and H-1B perform the interlocking task of recruiting students to pursue a course of

study in the United States and retaining at least a portion of those individuals to work in the

American economy.  The 2008 Rule supports this interpretation.  As DHS explained,

> [m]any employers who hire F-1 students under the OPT program eventually file a
> petition on the students' behalf for classification as an H-1B worker in a specialty
> occupation. If the student is maintaining his or her F-1 nonimmigrant status, the
> employer may also include a request to have the student's nonimmigrant status
> changed to H-1B.

2008 Rule at 18,496.

In fact, DHS identified the problem with transitioning individuals from F-1 to H-1B as

the "cap gap," which occurs when an F-1 student is the beneficiary of an approved H-1B visa,

but whose period of authorized stay expires before their designated H-1B employment start date.

*See id.* at 18,497.  To remedy the cap gap, the 2008 Rule "extends the authorized period of stay,

as well as work authorization, of any F-1 student who is the beneficiary of a timely-filed H-1B

petition that has been granted by, or remains pending with, USCIS."  *Id.*; *see* 8 C.F.R. §

214.2(f)(5)(vi).  In light of this tight connection between F-1 and H-1B, the Court concludes that

the provisions are integrally related and that it is appropriate to consider H-1B when measuring the relevant zone of interests.[3]

Defendant argues that finding an integral relationship between F-1 and H-1B "could potentially provide standing to challenge almost every agency decision relating to the admission of nonimmigrants, which would deprive the zone-of-interest requirement of all meaning." (Def.'s ZOI Mem. at 9 (citing *FAIR*, 93 F.3d at 903-04).)  Not so.  As this Court has explained, F-1 and H-1B constitute a complementary statutory mechanism for attracting foreign students and retaining those students after they complete their studies.  The relationship between these provisions is starkly evident from the 2008 Rule itself, which, while promulgated pursuant to F-1, is concerned entirely with compensating for the deficiencies in H-1B.  The Court doubts that such a relationship exists between H-1B and many of the other nonimmigrant categories.  *See, e.g.*, 8 U.S.C. § 1101(a)(15)(A)(i) (nonimmigrant status for diplomats); *id.* § 1101(a)(15)(I) (representatives of foreign press); *id.* § 1101(a)(15)(T) (victims of human trafficking).  As such, this Court's limited holding of a relationship between F-1 and H-1B does not implicate the concerns raised in *FAIR*.  *See* 99 F.3d at 904 ("Of course every immigration provision is in a broad sense part of the framework of every other provision. But if that were enough, then every provision constraining the admission of anyone under any circumstances . . . would be pertinent in applying the zone-of-interests test to *any* provision.").

---

[3] The portion of the 2008 Rule at issue in this lawsuit further buttresses the notion that the two provisions are integrally related.  Defendant argues at length that Congress has acquiesced in DHS's interpretation that F-1 can cover students post-completion.  As explained in Section III.C *infra*, the Court agrees with this argument.  Consequently, F-1 and H-1B apply to overlapping populations of nonimmigrants.  A point that defendant appears to endorse.  (*See* Def.'s ZOI Mem. at 9 ("The INA establishes a comprehensive scheme defining various nonimmigrant categories, and many of these categories overlap in point of the subject matter regulated." (citation omitted)).)  This overlap further establishes the integral relationship between F-1 and H-1B.

Finally, even if this Court were to consider F-1 in isolation, it would find that plaintiff

falls within that statute's zone of interests.  First and foremost, the Court finds significant the use

of the word "solely" in the F-1 subsection.  *See* 8 U.S.C. § 1101(a)(15)(F)(i) (requiring that the

alien "seek[] to enter the United States temporarily and solely for the purpose of pursuing such a

course of study").  The Court reads this limitation as an attempt by Congress to restrict F-1

student employment and to prevent aliens from using F-1 as a means to come to the United

States to work.  Indeed, this view was espoused by the Commissioner of INS in his testimony

before Congress in 1975.  *See Review of Immigration Problems: Hearings Before the Subcomm.*

*on Immigration, Citizenship, and Int'l Law of the H. Comm. on the Judiciary*, 94th Cong. 21

(1975) (statement of Hon. Leonard F. Chapman, Jr., Comm'r of INS) ("I emphasize the word

'solely' . . . as to emphasize that the effect of the law is that the student must come here solely to

pursue his education. That does not imply that he can come here with the expectation and

intention of working.").  Second, in 1990, Congress established a three-year pilot program to

permit F-1 students in good academic standing to work off-campus "in a position unrelated to the

alien's field of study" for less than 20 hours a week.  Immigration Act of 1990, Pub. L. No. 101-

649, § 221, 104 Stat. 4978, 5027.  Congress required employers to attest that the alien and other

similarly situated workers were being paid prevailing wages.  *Id.*  Congress also mandated that,

by 1994, the Commissioner of INS submit a report on the program, including its "impact . . . on

prevailing wages of workers."  *Id.*  The agency issued the report and ultimately recommended

against extending the program.  (*See* Pl.'s Mem. of Law in Supp. of Prudential Standing [ECF

No. 21] ("Pl.'s ZOI Mem."), App. at 9.)  Among its concerns, the agency noted that "[t]here is

the potential for job competition between foreign students and local youth."  (*Id.* at 4.)  It also

speculated that U.S. workers might be "clos[ed]" out of "selected occupations and jobs" by

16

"[n]etwork-based hiring" of foreign students.  (*Id.* at 5.)  Ultimately, the report concluded that

the "off-campus F-1 pilot program can have adverse consequences for some American workers."

(*Id.* at 6.)  Congress followed the report's recommendation and let the program lapse.  This pilot

program – and Congress' decision to cancel it – makes clear that Congress is aware of and

concerned about the impact of F-1 student employment on the U.S. labor market.  This

conclusion is unsurprising given that "[a] primary purpose in restricting immigration is to

preserve jobs for American workers."[4]  *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 893 (1984).  The

individuals in plaintiff's organization are therefore "arguably within the zone of interests to be

protected" by F-1.  *Patchak*, 132 S. Ct. at 2210 (internal quotation marks omitted).

## III.    STATUTORY AUTHORITY

### A.  STANDARD OF REVIEW

Plaintiff's principal argument is that DHS exceeded its statutory authority by issuing the

2008 Rule.  (*See* Pl.'s Mot. at 16-22.)  As an initial matter, however, the parties disagree as to the

level of deference this Court should accord the agency's actions.  Plaintiff argues that "DHS

forfeited deference under *Chevron* because it failed to provide notice and comment for any of the

actions at issue" and urges this Court to apply the standard of review articulated in *Skidmore v.

Swift & Co.*, 323 U.S. 134 (1944).  (Pl.'s Mot. at 11.)  Defendant counters that *Chevron* applies

because Congress delegated to DHS the "authority to speak with the force of law through

rulemaking."  (*See* Def.'s Opp. at 17.)

---

[4] While it is true that the zone-of-interests test is concerned with the "particular provision of law
upon which the plaintiff relies," *see Bennett v. Spear*, 520 U.S. 154, 175-176 (1997), the
Supreme Court's recent *Lexmark* decision suggests that courts should consider the overall
purpose of the statute when interpreting the zone of interests for particular provisions.  *See
Permapost Prods. v. McHugh*, 55 F. Supp. 3d 14, 26 n.6 (D.D.C. 2014).

"*Chevron* deference is appropriate 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'"  *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 57 (2011) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  Contrary to plaintiff's argument, the Supreme Court in *Mead* held that, while notice and comment is "significant  . . . in pointing to *Chevron* authority, the want of that procedure . . . does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded."  533 U.S. at 230-31; *accord Barnhart v. Walton*, 535 U.S. 212, 221 (2002) ("[T]he fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due." (citation omitted)).

Congress has delegated substantial authority to DHS to issue immigration regulations. This delegation includes broad powers to enforce the INA and a narrower directive to issue rules governing nonimmigrants.  *See* 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens . . . ."); *id.* § 1103(a)(3) ("[The Secretary of Homeland Security] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA]."); *id.* § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including when he deems necessary the giving of a bond with sufficient surety in such sum and containing such

conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, . . . such alien will depart from the United States.").

The 2008 Rule was promulgated as an exercise of this delegated authority. The subject matter of the 2008 Rule falls squarely within the ambit of § 1184(a)(1), and the Rule invokes that statute in listing its sources of authority. *See* 2008 Rule at 18,954. The Rule was published in the Federal Register, and the agency provided the public with a post-publication comment period. *Id.* at 18,945; *see Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 467 (D.C. Cir. 2007) ("Although publication in the federal register is not in itself sufficient to constitute an agency's intent that its pronouncement have the force of law, where, as here, that publication reflects a deliberating agency's self-binding choice, as well as a declaration of policy, it is further evidence of a *Chevron*-worthy interpretation." (citation omitted)). Unlike the Customs ruling letter in *Mead*, which was not binding as to third parties, the 2008 Rule was clearly issued "with a lawmaking pretense in mind" and was intended to have "the force of law." 533 U.S. at 233. As such, the Court concludes that *Chevron* deference is appropriate.

## B. *CHEVRON* STEP ONE

Under *Chevron* step one, this Court must determine whether "Congress has 'directly addressed the precise question at issue.'" *Mayo Found.*, 562 U.S. at 52 (quoting *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984)). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Plaintiff argues that "[t]he term *student* is not ambiguous." (Pl.'s Mot. at 17.) Citing several dictionary definitions, plaintiff contends that F-1 nonimmigrants engaging in post-completion OPT cannot be considered

19

students because "[t]hey are not attending schools." (*Id.*)  Plaintiff further contends that other

parts of the F-1 statute, such as the requirement that the student "enter the United States . . .

solely for the purpose of pursuing such a course of study," demonstrate that the statute

"unambiguously define[s] a *student* as one who attends specific, approved schools." (*Id.* at 18.)

In response, defendant argues that the statute is ambiguous in that it does not define the terms

"student" or "course of study," and contends that this congressional silence leaves "an ambiguity

for the agency to resolve." (Def.'s Mot. at 17.)  Defendant also points out that "the agency has

long interpreted the foreign student provision to allow for employment of students during

practical training." (*Id.* at 21.)

   The Court agrees that the statute's lack of a definition for the term "student" creates

ambiguity.  As the Supreme Court said in *Chevron*, "if the statute is silent or ambiguous with

respect to the specific issue, the question for the court is whether the agency's answer is based on

a permissible construction of the statute."  467 U.S. at 843.  And, in the context of a tax statute,

the Supreme Court recently held that the word "student" was ambiguous with respect to medical

residents because "[t]he statute does not define the term 'student,' and does not otherwise attend

to the precise question whether medical residents are subject to FICA."[5]  *Mayo Found.*, 562 U.S.

at 52.

   This Court is not persuaded by plaintiff's argument that the statutory context clarifies the

word "student."  To be sure, F-1 defines a nonimmigrant as a student "who seeks to enter the

---

[5] *Mayo* is not dispositive of the present case because the medical residents were still participating in "a formal and structured educational program," even though the bulk of their time was spent caring for patients.  *Mayo Found.*, 562 U.S. at 48.  Interestingly, however, the statute at issue in *Mayo* contained an additional qualification: the students were exempt from FICA taxes only if they were "enrolled and regularly attending classes at [a] school, college, or university." *Id.* at 49 (quoting 26 § 3121(b)(10) (2006 ed.)).  The absence of such a qualifier in F-1 highlights the ambiguous scope of the word "student" in § 1101(a)(15)(F)(i).

United States temporarily and solely for the purpose of pursuing such a course of study . . . at" an approved academic institution.  8 U.S.C. § 1101(a)(15)(F)(i).  However, as argued by defendant, this clause could sensibly be read as an *entry requirement*.  (Def.'s Opp. at 21 ("[T]he INA definition of 'student' is only the definition of what is required to be proved at the time of admission to obtain a student visa.").)  This reading is bolstered by Congress' delegation of the power to prescribe regulations related to a nonimmigrant's duration of stay.  *See* 8 U.S.C. § 1184(a)(1).

Moreover, several pieces of evidence indicate that Congress understood F-1 to permit at least some period of employment.  For example, as discussed in Section II *supra*, in 1990, Congress implemented a pilot program that allowed F-1 students to work up to 20 hours per week in a job unrelated to their field of study.  *See* Immigration Act of 1990 § 221.  And F-1 nonimmigrants are explicitly exempted from several wage taxes.  *See* 26 U.S.C. §§ 3121(b)(19), 3306(c)(19); 42 U.S.C. § 410(a)(19).  These statutory provisions lend credence to defendant's argument that the clause in F-1 – "solely for the purpose of pursuing such a course of study" – does not foreclose employment.  Since F-1 does not bar *all* foreign student employment, it is not clear what employment the statute *does* permit.  As such, the statute's text is ambiguous as to whether such employment may extend for a period of time after they complete their studies.

Dictionary definitions are similarly unhelpful in clarifying this statutory ambiguity.  To be sure, some definitions of the word "student" require school attendance.  *E.g.*, *Student, Ballentine's Law Dictionary* (3d ed. 2010) ("A person in attendance at a college or university. One receiving instruction in a public or private school.").  Most, however, include broader notions of studying and learning.  *E.g.*, *Student, Merriam Webster's Collegiate Dictionary* (10th ed. 1997) ("SCHOLAR, LEARNER, especially: one who attends a school . . . . One who studies:

an attentive and systematic observer."); *Student, Oxford English Dictionary* ("A person who is

engaged in or addicted to study. . . . A person who is undergoing a course of study and

instruction at a university or other place of higher education or technical training."),

http://www.oed.com (last visited Aug. 5, 2015).  These definitions are unhelpful not only

because they are competing, but because they do not address the fundamental ambiguity

presented by this case.  No one disputes that all F-1 aliens enter the United States as "students"

under any conceivable definition, since they must enroll at a qualifying academic institution.

The ambiguity is whether the scope of F-1 encompasses post-completion practical training

related to the student's field of study.  Neither dictionary definitions nor statutory context

resolves this issue.  The Court concludes that the statute is ambiguous. [6]

### C. *CHEVRON* STEP TWO

The second step of *Chevron* asks whether the 2008 Rule "is a 'reasonable interpretation'

of the enacted text."  *Mayo Found.*, 562 U.S. at 58 (quoting *Chevron*, 467 U.S. at 844).  This

Court must uphold the Rule unless it is "arbitrary, capricious, or manifestly contrary to the

statute."  *Chevron*, 467 U.S. at 844; *see also Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215

F.3d 61, 71 (D.C. Cir. 2000) ("Under *Chevron*, we are bound to uphold agency interpretations as

long as they are reasonable – 'regardless whether there may be other reasonable, or even more

reasonable, views.'" (quoting *Serono Lab., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir.

1998))).

Defendant argues that Congress' "longstanding acquiescence" in its interpretation

suggests its reasonableness.  (Def.'s Mot. at 31.)  In particular, it contends that federal agencies

---

[6] This Court's conclusion that F-1 is ambiguous is reinforced by Congress' longstanding
acquiescence in DHS's interpretation, discussed in Section III.C *infra*.

have interpreted F-1 to allow for post-completion practical training for over 60 years, and that Congress has never abrogated that interpretation despite amending the statute multiple times. (*See id.* at 21.)  Plaintiff responds that Congress could not have acquiesced in DHS's interpretation of F-1 because that interpretation has frequently changed, and there is insufficient evidence to establish that Congress was actually aware of the agency's interpretation.  (*See* Resp. Br. in Supp. of Pl.'s Cross Mot. for Summ. Judgment or Judgment on the Administrative Record [ECF No. 35] ("Pl.'s Opp.") at 5-9.)

"[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008) (alteration in original) (quoting *Doris Day Animal League v. Veneman*, 315 F.3d 297, 300 (D.C. Cir. 2003)); *see also Barnhart*, 535 U.S. at 220 ("Court[s] will normally accord particular deference to an agency interpretation of longstanding duration." (internal quotation marks omitted)); *Lindahl v. OPM*, 470 U.S. 768, 782 n.15 (1985) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change." (internal quotation marks omitted)).  The D.C. Circuit has cautioned, however, that the so-called "legislative reenactment" doctrine is of "little assistance" when Congress has "simply enacted a series of isolated amendments to other provisions."  *Public Citizen, Inc. v. HHS*, 332 F.3d 654, 668 (D.C. Cir. 2003).  Moreover, there must be "some evidence of (or reason to assume) congressional familiarity with the administrative interpretation at issue."  *Id.* at 669.

Since at least 1947, INS and DHS have interpreted the immigration laws to allow foreign

students to engage in employment for practical training purposes.  *See* 12 Fed. Reg. at 5357 ("In

cases where employment for practical training is required or recommended by the school, the

district director may permit the student to engage in such employment for a six-month period

subject to extension for not over two additional six-month periods . . . .").  In 1952, Congress

overhauled the immigration laws with the Immigration and Nationality Act, which created the

modern category of student nonimmigrants.  *See* Immigration and Nationality Act, Pub. L. No.

82-414, § 101(a)(15)(F), 66 Stat. 163, 168 (1952).  INS continued to interpret the law to permit

foreign students to engage in practical training.[7]  *See, e.g.*, Special Requirements for Admission,

---

[7] While the 1947 and 1973 regulations do not explicitly authorize post-completion practical
training, several pieces of evidence strongly suggest that these provisions allowed alien students
to engage in full-time, post-completion employment without simultaneously attending classes.
First, both the 1947 and 1973 regulations, in addition to permitting students to engage in
practical training, allowed students to work out of financial necessity, but only if the employment
would not interfere with the student's ongoing course of study.  *See* 12 Fed. Reg. at 5357; 38
Fed. Reg. at 35,426.  The practical training subsections included no similar limitation. Second,
contemporary documents demonstrate an understanding that those practical training regulations
allowed full-time, post-completion employment.  For example, in *Matter of T-*, 7 I. & N. Dec.
682 (B.I.A. 1958), the Board of Immigration Appeals noted that the "length of authorized
practical training should be reasonably proportionate to the period of formal study in the subject
which has been completed by the student" and that only in "unusual circumstances" would
"practical training . . . be authorized before the beginning of or during a period of formal study."
*Id.* at 684; *see also Matter of Yau*, 13 I. & N. Dec. 75, 75 (B.I.A. 1968) (noting that an alien
student had been granted permission to engage in practical training after graduating); *Matter of
Ibarra*, 13 I. & N. Dec. 277, 277-78 (B.I.A. 1968) (same); *Matter of Alberga*, 10 I. & N. Dec.
764, 765 (B.I.A. 1964) (same).  Moreover, a 1950 Report by the Senate Committee on the
Judiciary, in describing foreign student employment, stated that "practical training has been
authorized for 6 months after completion of the student's regular course of study."  S. Rep. No.
81-1515, at 503 (1950).  The Report also noted a "suggestion that the laws . . . be liberalized to
permit foreign students to take practical training before completing their formal studies."  *Id.* at
505.  Similarly, a House Report from 1961 disclosed that, on April 24, 1959, the Department of
State, acting in concert with INS, issued a notice to its officers that "[s]tudents whom the
sponsoring schools recommend for practical training should be permitted to remain for such
purposes up to 18 months after receiving their degrees or certificates."  H.R. Rep. No. 87-721, at
15 (1961).  Finally, in a 1975 statement to Congress on the subject of foreign students, the
Commissioner of INS noted that, although there "is no express provision in the law for an F-1

Extension, and Maintenance of Status, 38 Fed. Reg. 35,425, 35,426 (Dec. 28, 1973) (allowing foreign students to secure employment "in order to obtain practical training . . . in his field of study," if such training "would not be available to the student in the country of his foreign residence," for a maximum of 18 months).  And, at least as early as 1983, INS explicitly authorized post-completion practical training.[8]  Nonimmigrant Classes; Change of Nonimmigrant Classification; Revision in Regulations Pertaining to Nonimmigrant Students and the Schools Approved for Their Attendance, 48 Fed. Reg. 14,575, 14,586 (Apr. 5, 1983) (allowing students to engage in practical training "[a]fter completion of the course of study"); Retention and Reporting Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS), 67 Fed. Reg. 76,256, 76,274 (Dec. 11, 2002) (same).

Since 1952, Congress has amended the provisions governing nonimmigrant students on several occasions.  *See* Pub. L. No. 87-256, § 109(a), 75 Stat. 527, 534 (Sept. 21, 1961) (allowing an F-1 nonimmigrant's alien spouse and minor children to accompany him); Immigration Act of 1990 § 221(a) (permitting F-1 nonimmigrants to engage in limited employment unrelated to their field of study); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 625, 110 Stat. 3009-546, 3009-699 (adding limitations related to F-1 nonimmigrants at public schools); Enhanced Border Security and Visa

---

student to engage in employment," such a student could engage in practical training on a full-time basis for up to eighteen months.  *Review of Immigration Problems: Hearings Before the Subcomm. on Immigration, Citizenship, and Int'l Law of the H. Comm. on the Judiciary*, 94th Cong. 21, 23 (1975) (statement of Hon. Leonard F. Chapman, Jr., Comm'r of INS).

[8] To be sure, plaintiff is correct that the details of the practical training regulations have changed over the decades.  (Pl.'s Opp. at 6.)  Notwithstanding these changes, however, INS and DHS have, since 1947, consistently interpreted the immigration laws to permit post-completion practical training.  *See supra* note 7.  Congress' acquiescence in this longstanding interpretation undercuts plaintiff's argument that the word "student" unambiguously requires F-1 nonimmigrants to maintain ongoing enrollment in a school or university.

Entry Reform Act of 2002, Pub. L. No. 107-173, §§ 501-502, 116 Stat. 543, 560-63

(implementing monitoring requirements for foreign students); Pub. L. No. 111-306, § 1, 124

Stat. 3280, 3280 (Dec. 14, 2010) (amending F-1 with respect to language training programs).

During that time, Congress has also imposed various labor protections for domestic workers.

*E.g.*, Immigration Act of 1990 § 205 (requiring a labor condition certification for H-1B

nonimmigrants from the employer attesting that the alien will be paid the prevailing wage and

that the alien's employment will not adversely affect working conditions); *id.* § 221 (requiring a

similar certification for F-1 nonimmigrants working in a position unrelated to their field of

study); American Competitiveness and Workforce Improvement Act of 1998, Pub. L. No. 105-

277, § 412, 112 Stat. 2681-641, 2681-642 (requiring employers of H-1B nonimmigrants to

certify that they "did not displace and will not displace a United States worker"). 

Notwithstanding this legislative activity, Congress has never repudiated INS or DHS's

interpretation permitting foreign students to engage in post-completion practical training.

   This legislative history leads the Court to two conclusions.  First, DHS's interpretation of

F-1 – inasmuch as it permits employment for training purposes without requiring ongoing school

enrollment – is "longstanding" and entitled to deference.  *See Barnhart*, 535 U.S. at 220.

Second, Congress has repeatedly and substantially amended the relevant statutes without

disturbing this interpretation.  These amendments have not been "isolated."  *Public Citizen*, 332

F.3d at 668.  The Immigration and Nationality Act of 1952, in particular, radically changed the

country's immigration system.  And, the Immigration Act of 1990 imposed a host of new

protections for domestic workers and explicitly authorized F-1 students to engage in certain

forms of employment.  By leaving the agency's interpretation of F-1 undisturbed for almost 70

years, notwithstanding these significant overhauls, Congress has strongly signaled that it finds

DHS's interpretation to be reasonable.

Plaintiff objects that there is insufficient evidence to prove that Congress was aware of

DHS's interpretation.  (*See* Pl.'s Opp. at 7-9.)  The Court disagrees.  As an initial matter, as

explained above, DHS's interpretation of F-1 clearly dates back to 1983, and likely to 1947.  *See*

*supra* note 7.  Congressional obliviousness of such an old interpretation of such a frequently

amended statute strikes this Court as unlikely.  In any case, ample evidence indicates

congressional awareness.  Congress' 1990 amendment of the INA included a three-year pilot

program authorizing F-1 student employment for positions that were "unrelated to the alien's

field of study."  Immigration Act of 1990 § 221(a).  Considered in isolation, this provision is

perplexing – why would Congress only authorize foreign students to do work *unrelated* to their

schooling?  The answer, of course, is that INS's regulations already authorized student

employment related to the student's field of study, and these regulations were explicit in

permitting post-completion employment.  *See* 8 C.F.R. § 214.2(f)(10) (1989) (authorizing F-1

students to engage in "[p]ractical training prior to completion of studies" or "after completion of

studies" upon certification that "the proposed employment . . . is related to the student's course

of study").  Moreover, in recommending against the continuation of the pilot program, the

Commissioner of INS specifically referenced post-completion practical training.  (Pl.'s ZOI

Mem., App. at 10.)

Several other pieces of legislative history suggest that Congress was aware of the

practical training program.  The program was described at length in a 1950 Senate Report, a

1961 House Report, and 1975 congressional testimony by the Commissioner of INS.  *See supra*

note 7.  In addition, the practical training program has been discussed during multiple

27

congressional hearings.  *E.g.*, *Immigration Policy: An Overview: Hearing Before the Subcomm. on Immigration of the S. Comm. on the Judiciary*, 107th Cong. 15-16 (2001) (statement of Warren R. Leiden, American Immigration Lawyers Assocation); *Immigration Reform: Hearing Before the Subcomm. on Immigration and Refugee Affairs of the S. Comm. on the Judiciary on S. 358 and S. 448*, 101st Cong. 485-86 (1989) (statement of Frank D. Kittredge, President, National Foreign Trade Council); *Immigration Reform and Control Act of 1983: Hearings Before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary on H.R. 1510*, 98th Cong. 687, 695, 698 (1983) (statement of Billy E. Reed, Director, American Engineering Association); *Illegal Aliens: Hearings Before Subcomm. No. 1 of the H. Comm. on the Judiciary*, 92d Cong. 265-66 (1971) (statement of Sam Bernsen, Assistant Comm'r, INS). The Court finds this evidence more than sufficient to demonstrate "congressional familiarity with the administrative interpretation at issue."  *See Public Citizen*, 332 F.3d at 669.

Plaintiff makes several other arguments in an attempt to demonstrate that DHS's interpretation is unreasonable.  First, it contends that DHS has "circumvent[ed] [H-1B's] statutory restrictions that rightfully should be applied" to college-educated labor.  (Pl.'s Mot. at 20.)  But H-1B – which applies to aliens seeking to work in a "specialty occupation," 8 U.S.C. § 1101(a)(15)(H)(i)(b) – is far broader than the employment permitted by the OPT program. DHS's interpretation of the word "student" does not render any portion of H-1B, or its related restrictions, surplusage.  Congress has tolerated practical training of alien students for almost 70 years, and it did nothing to prevent a potential overlap between F-1 and H-1B when it created the modern H-1B category in 1990.  *See* Immigration Act of 1990 § 205(c).  As such, the Court does not believe that DHS's interpretation is unreasonable merely because of its limited overlap with H-1B.

Plaintiff also contends that "[t]here is not a scintilla of a statutory authorization for DHS to use student visas to remedy labor shortages."  (Pl.'s Mot. at 22.)  The Court disagrees.  DHS has been broadly delegated the authority to regulate the terms and conditions of a nonimmigrant's stay, include its duration.  *See* 8 U.S.C. § 1103(a); *id.* § 1184(a)(1).  One of DHS's statutorily enumerated goals is to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."  6 U.S.C. § 111(b)(1)(F).  Moreover, a significant purpose of immigration policy is to balance the productivity gains that aliens provide to our nation against the potential threat to the domestic labor market.  *Compare In re Griffiths*, 413 U.S. 717, 719 (1973) ("From its inception, our Nation welcomed and drew strength from the immigration of aliens. Their contributions to the social and economic life of the country were self-evident, especially during the periods when the demand for human resources greatly exceeded the native supply."), *with Sure-Tan*, 467 U.S. at 893 ("A primary purpose in restricting immigration is to preserve jobs for American workers . . . .").  Indeed, in its zone-of-interests memorandum, plaintiff argues that "the interest of safeguarding American workers is inextricably intertwined with employment on F-1 student visas."  (Pl.'s ZOI Mem. at 9.)  The Court concurs.  DHS's consideration of the economic impact of extending the OPT program does not render its interpretation unreasonable.[9]

---

[9] To be clear, at this stage the Court is only considering whether the agency's interpretation of the statute is unreasonable, not whether the agency's regulation is substantively deficient under 5 U.S.C. § 706.  *See Council for Urological Interests v. Burwell*, 2015 U.S. App. LEXIS 9867, at *25 (D.C. Cir. June 12, 2015) ("[A]lthough *Chevron*'s second step sounds closely akin to plain vanilla arbitrary-and-capricious style review, interpreting a statute is quite a different enterprise than policy-making." (internal quotation marks omitted)).  In light of the holding in Section IV *infra*, the Court withholds judgment on the issue of whether the agency has marshaled sufficient evidence to support its rule.

In light of Congress' broad delegation of authority to DHS to regulate the duration of a nonimmigrant's stay and Congress' acquiescence in DHS's longstanding reading of F-1, the Court concludes that the agency's interpretation is not unreasonable.

## IV.   EMERGENCY RULEMAKING

DHS promulgated the 2008 Rule without notice and comment.  In justifying this decision, the agency cited 5 U.S.C. § 553(b), which allows an agency to dispense with the notice-and-comment requirement "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  2008 Rule at 18,950.  The agency explained that 30,205 F-1 students were on OPT status that would expire between April 1 and July 31, 2008, that those students "will need to leave the United States unless they are able to obtain an H-1B visa for FY09 or otherwise maintain their lawful nonimmigrant status," and that the 17-month extension "has the potential to add tens of thousands of OPT workers to the total population of OPT workers in STEM occupations in the U.S. economy."  *Id.*  The agency concluded that it had good cause to issue the rule without notice and comment because

> [t]he ability of U.S. high-tech employers to retain skilled technical workers . . . would be seriously damaged if the extension of the maximum OPT period to twenty-nine months for F-1 students who have received a degree in science, technology, engineering, or mathematics is not implemented early this spring, before F-1 students complete their studies and, without this rule in place and effective, would be required to leave the United States.

*Id.*  Plaintiff disputes this conclusion, contending that none of the § 553(b) exemptions applies to the 2008 Rule.  (*See* Pl.'s Mot. at 23-27.)

This Court reviews an agency's good-cause determination without deference.  *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014).  The D.C. Circuit has

"repeatedly made clear that the good cause exception 'is to be narrowly construed and only reluctantly countenanced.'"  *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001)).  Determining whether notice and comment is impracticable "is an 'inevitably fact-or-context dependent' inquiry."[10]  *Sorenson*, 755 F.3d at 706 (quoting *Mid-Tex Elec. Coop. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987)).  In the past, the D.C. Circuit has "approved an agency's decision to bypass notice and comment where delay would imminently threaten life or physical property."  *Id.*; *see also Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (finding good cause when rule was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States").

The Circuit has recently considered whether an economic crisis could sustain a good-cause determination under § 553(b).  In *Sorenson*, the Federal Communications Commission bypassed notice and comment in promulgating rules imposing certification requirements on hearing-impaired individuals receiving telephones with captioning capability.  755 F.3d at 704-05.  The rules were precipitated by the plaintiff distributing free captioning-enabled phones, which in turn greatly increased the demand for captioning services that are subsidized by a government-organized fund.  *Id.*  Although the D.C. Circuit would "not exclude the possibility that a fiscal calamity could conceivably justify bypassing the notice-and-comment requirement," it found that the record before it was "simply too scant to establish a fiscal emergency."  *Id.* at 707.  The Circuit noted that the administrative record did "not reveal when the Fund was

---

[10] Defendant does not explicitly state that it was relying on the "impracticability" prong of § 533(b), but nowhere does it suggest that notice and comment would have been "unnecessary" or "contrary to the public interest."  5 U.S.C. § 553(b).  All of its arguments revolve around the purported urgency it faced in issuing the rule, which this Court takes to mean that the delay inherent in giving notice and soliciting comment would have been impracticable.

expected to run out of money, whether the Fund would have run out of money before a notice-and-comment period could elapse, or whether there were reasonable alternatives available to the Commission." *Id.*

To demonstrate the urgency of the situation it faced in issuing the 2008 Rule, DHS relied principally on three sources: a 2008 report by the National Science Foundation titled *Science and Engineering Indicators, 2008* ("*Indicators*") (Joint Appendix: Administrative Record Excerpts [ECF No. 26] ("JA") at 135-536[11]); a 2005 report by the National Academy of Sciences titled *Rising Above the Gathering Storm: Energizing and Employing America for a Brighter Economic Future* ("*Gathering Storm*") (JA at 1366-1803); and a collection of submissions from Members of Congress and stakeholders in the technology industry.[12]  (JA at 97-134.)

The Court has reviewed these materials and finds that they fail to demonstrate that the 2008 Rule was necessary to forestall a "fiscal emergency."  *See Sorenson*, 755 F.3d at 707.  The first problem is that the record does not establish the economic consequences of failing to immediately issue the rule.  The reports cited by the agency speak only in very general terms about the importance of STEM workers to the U.S. economy.  (*See, e.g.*, *Indicators* at 158 ("Indicators of the shift toward knowledge-intensive economic activity abound. . . . Countries are investing heavily in expansion and quality improvements of their higher education systems, easing access to them, and often directing sizable portions of this investment to training in science, engineering, and related S&T fields."); *id.* at 172 ("The progressive shift toward more

---

[11] The Court will use the administrative record's numbering when citing the joint appendix.

[12] DHS cited one additional study that does not appear in the joint appendix, which the Court has also reviewed.  Task Force on the Future of American Innovation, *Measuring the Moment: Innovation, National Security, and Economic Competitiveness* (Nov. 2006), http://www.innovationtaskforce.org/docs/Benchmarks%20-%202006.pdf.

knowledge-intensive economies around the world is dependent upon the availability and

continued inflow of individuals with postsecondary training to the workforce."); *id.* at 338

("Migration of skilled S&E workers across borders is increasingly seen as a major determinant of

the quality and flexibility of the labor force in most industrialized countries. . . . The United

States has benefited, and continues to benefit, from this international flow of knowledge and

personnel . . . ."); *Gathering Storm* at 1552 ("The biggest concern is that our competitive

advantage, our success in global markets, our economic growth, and our standard of living all

depends on maintaining a leading position in science, technology, and innovation.  As that lead

shrinks, we risk losing the advantages on which our economy depends."); *id.* at 1553 ("This

nation's science and technology policy must account for the new reality and embrace strategies

for success in a world where talent and capital can easily choose to go elsewhere."))  To be sure,

these quotations highlight the importance of science and technology to the U.S. economy as a

general matter.  But nowhere do the reports contemplate the role of recent graduates with F-1

visas in sustaining the pace of innovation.  And, they certainly do not consider the economic

impact of delaying the rule for however long it would have taken to solicit broader feedback via

notice and comment.

 Defendant's contention that notice and comment would have been impracticable is

further undercut by the fact that H-1B oversubscription is old hat.  As defendant concedes,

"[f]rom the time the visa numbers allocated for the H-1B program were reduced . . . from

195,000 to 65,000 in fiscal year 2004, the H-1B program has been consistently oversubscribed."

(Def.'s Mot. at 43 (citation omitted); *see also* 2008 Rule at 18,946 (noting that the H-1B limit

has been reached progressively earlier every year since 2004).)  Presumably, at least some F-1

students had been unable to obtain an H-1B visa and were forced to leave the country for each of

the four years prior to the issuance of the 2008 Rule, but defendant gives no evidence that these exits contributed to an economic crisis.[13]   Moreover, the consistent H-1B oversubscription should have made the economic consequences identified by defendant entirely predictable. Indeed, much of the evidence before the agency had long been available to DHS.   Bill Gates testified before Congress on March 7, 2007 – 13 months before DHS issued the 2008 Rule – about the shortage of H-1B visas.   (JA at 106.)   And the report relied on by DHS describing the dangers to American competitiveness of losing STEM workers was published in 2005.   (*Id.* at 1367.)

Defendant does not explain why it waited to initiate proceedings on this issue, and it has not pointed to any changed circumstances that made the OPT extension suddenly urgent.   The Court therefore finds that DHS's self-imposed deadline of April 2008 lacks support in the record. DHS has thus failed to carry its burden to show that it faced an "emergency situation[]," *Jifry*, 370 F.3d at 1179, that exempted it from subjecting the 2008 Rule to notice and comment.

## V.   REMEDY

Plaintiff contends that "[t]he procedural defects of the OPT Rules are so great that vacatur is the appropriate remedy."   (Pl.'s Reply at 8.)   Defendant responds that, "because of the

---

[13] The only items in the record that speak to the impact of the H-1B cap on economic competitiveness are letters from interested stakeholders.   For example, in a letter dated November 15, 2007, Microsoft lamented the difficulty of obtaining H-1B visas for its employees, noting that "[t]o compete globally . . . Microsoft . . . must have access to the talent it needs."   (JA at 121.)   Even these letters, however, do not articulate the immediate impact of failing to extend OPT.   Moreover, by failing to engage in notice-and-comment rulemaking, the record is largely one-sided, with input only from technology companies that stand to benefit from additional F-1 student employees, who are exempted from various wage taxes.   *See* 26 U.S.C. §§ 3121(b)(19), 3306(c)(19); 42 U.S.C. § 410(a)(19).   Indeed, the 17-month duration of the STEM extension appears to have been adopted directly from the unanimous suggestions by Microsoft and similar industry groups.   (*See* JA 115, 121, 125, 126.)

34

emergency situation invalidation would cause, the appropriate course of action would be an order

that holds any *vacatur* in temporary abeyance."  (Def.'s Opp. at 43.)

The "decision whether to vacate depends on the seriousness of the [rule's] deficiencies

(and thus the extent of doubt whether the agency chose correctly) and the disruptive

consequences of an interim change that may itself be changed."  *Comcast Corp. v. FCC*, 579

F.3d 1, 8 (D.C. Cir. 2009) (alteration in original) (quoting *Allied-Signal, Inc. v. Nuclear

Regulatory* Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  "When an agency may be able

readily to cure a defect in its explanation of a decision, the first factor in *Allied-Signal* counsels

remand without vacatur."  *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir.

2009).  In contrast, "[f]ailure to provide the required notice and to invite public comment – in

contrast to the agency's failure . . . adequately to explain why it chose one approach rather than

another for one aspect of an otherwise permissible rule – is a fundamental flaw that 'normally'

requires vacatur of the rule."  *Id.* at 199.  With respect to the second *Allied-Signal* factor,

"[w]here the proverbial 'egg has been scrambled and there is no apparent way to restore the

status quo ante,' the Court may remand without vacating."  *Defenders of Wildlife v. Jackson*, 791

F. Supp. 2d 96, 118 (D.D.C. 2011) (quoting *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d

89, 97-98 (D.C. Cir. 2002)).  A middle ground embraced by several courts in this Circuit is to

vacate the challenged rule but to stay the vacatur for a period of time.  *E.g.*, *Chamber of

Commerce of U.S. v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006) ("The Commission is in a better

position than the court to assess the disruptive effect of vacating the Rule's two conditions. . . .

Therefore, the court will . . . withhold the issuance of its mandate . . . for ninety days."); *Indep.

U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987) ("In this case, we

vacate the rule because the Secretary's omissions are quite serious . . . . Yet we exercise our

power to withhold issuance of our mandate [for six months], to avoid further disruptions in the

domestic market and to allow the Secretary to undertake further proceedings to address the

problems of the merchant marine trade."); *Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp.

2d 50, 52 (D.D.C. 2010) ("Because remand without vacatur is inappropriate, . . . the Court will

vacate the challenged [rules], but will stay vacatur."); *Haw. Longline Ass'n v. Nat'l Marine

Fisheries Serv.*, 288 F. Supp. 2d 7, 12-13 (D.D.C. 2003).

The first *Allied-Signal* factor weighs heavily in favor of vacatur.  Failure to provide

notice and invite public comment is a serious procedural deficiency that counsels against remand

without vacatur.  *Heartland*, 566 F.3d at 199; *see also Allina Health Servs. v. Sebelius*, 746 F.3d

1102, 1110 (D.C. Cir. 2014) ("[D]eficient notice is a 'fundamental flaw' that almost always

requires vacatur." (quoting *Heartland*, 566 F.3d at 199)).  Indeed, defendant does not even

suggest such a remedy.  (*See* Def.'s Opp. at 43-45.)  However, the Court concludes that

immediate vacatur of the 2008 Rule would be seriously disruptive.  In 2008, DHS estimated that

there were approximately 70,000 F-1 students on OPT and that one-third had earned degrees in a

STEM field.  2008 Rule at 18,950.  While DHS has not disclosed the number of aliens currently

taking advantage of the OPT STEM extension, the Court has no doubt that vacating the 2008

Rule would force "thousands of foreign students with work authorizations . . . to scramble to

depart the United States."  (Def.'s Opp. at 44.)  Vacating the 2008 Rule could also impose a

costly burden on the U.S. tech sector if thousands of young workers had to leave their jobs in

short order.  The Court sees no way of immediately restoring the pre-2008 status quo without

causing substantial hardship for foreign students and a major labor disruption for the technology

sector.  As such, the Court will order that the 2008 Rule – and its subsequent amendments – be

vacated, but it will order that the vacatur be stayed.[14]  The stay will last until February 12, 2016,

during which time DHS can submit the 2008 Rule for proper notice and comment.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part both plaintiff's

motion for summary judgment [ECF No. 25] and defendant's motion for summary judgment

[ECF No. 27].  The Court will vacate the 17-month STEM extension described in the 2008 Rule,

73 Fed. Reg. 18,944 (Apr. 8, 2008), staying the vacatur until February 12, 2016, and will remand

to DHS for further proceedings consistent with this Memorandum Opinion.  An Order consistent

with this Memorandum Opinion will be issued on this day.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   August 12, 2015

---

[14] In light of this holding, the Court need not address plaintiff's arguments that DHS acted arbitrarily and capricious in promulgating the 2008 Rule and that DHS failed to follow the correct procedure in amending the list of STEM disciplines.  (*See* Pl.'s Mot. at 28-38.)